STATE of Iowa, Appellee,

v.

Donald PIPER, Appellant.

No. 01–1239.

Supreme Court of Iowa.

June 11, 2003.

Rehearing Denied July 1, 2003.

Alfredo Parrish and Tammy Westhoff of Parrish, Kruidenier, Moss, Dunn, Boles & Gribble, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan M. Horvat and Steven Foritano, Assistant County Attorneys, for appellee.

TERNUS, Justice.

The defendant, Donald Piper, appeals from his conviction and sentence for first-degree murder, alleging multiple grounds for reversal. Although we find no basis to reverse his conviction, we conclude the imposition of $150,000 in victim restitution pursuant to Iowa Code section 910.3B (1999) violates the Ex Post Facto Clause, an error conceded by the State. Accordingly, we affirm the judgment of conviction, vacate that portion of the sentence imposing a $150,000 obligation for victim restitution, otherwise affirm the defendant's sentence of life imprisonment, and remand for determination of restitution under the statute in effect at the time the offense was committed.

## I. *General Background.*

Patricia Lange was found murdered in her room at the University Park Holiday Inn in West Des Moines on Monday morning, August 23, 1993. She had a gag in her mouth and her hands were bound. Her top and bra had been pushed up to her shoulders and she had nothing on from the waist down except her tennis shoes and socks. It was determined the victim had been strangled with a wire coat hangar.

More than six years later, a match between DNA found at the murder scene and Donald Piper's DNA led authorities to charge the defendant with Lange's murder. *See* Iowa Code §§ 707.1, .2 (1999) (defining crime of first-degree murder). The trial information, filed in February 2000, alleged Piper killed Lange on August 22 or 23, 1993, with premeditation and malice aforethought or while committing sexual abuse and/or willful injury.

Piper pleaded not guilty and filed notice of an alibi defense. He claimed he was with his wife and other relatives during the weekend of August 21 and 22, and through the night of August 22 to Monday, August 23.

The defendant's first trial ended in a mistrial in October 2000 when it was learned for the first time by his attorney that a portion of a vaginal swab taken from the victim was available for testing. A second trial commenced on April 18, 2001, and ended forty-eight days later on June 4, when the jury found Piper guilty of first-degree murder. After the trial court overruled the defendant's motion for new trial, the court sentenced Piper to life imprisonment without the possibility of parole and ordered him to make restitution to the victim's estate in the amount of $150,000.

Piper's trial was marked by several disagreements between the parties over discovery, numerous evidentiary objections, and various motions, many of which resulted in rulings by the court that are now challenged by the defendant. The initial error assigned by the defendant is the court's failure to grant a mistrial or dismiss the case based on the State's late disclosure of evidence. Piper also claims the court erred in admitting evidence of an extramarital affair he had with a neighbor, and abused its discretion in admitting several exhibits for which there purportedly was an inadequate showing of a proper chain of custody. The defendant also complains of several jury-related errors: (1) the court should have removed a juror; (2) the jury's verdict was coerced; and (3) the court erred in failing to give instructions requested by the defendant. In addition, Piper asserts he was denied a fair trial because the prosecutors engaged in misconduct and due to the cumulative effect of the trial court's errors. Finally, the defendant alleges the court's order of restitution violated the Ex Post Facto Clauses of the United States and Iowa constitutions, an error the State acknowledges. We will

discuss additional facts as we address each assignment of error.

II. *Untimely Disclosure of Evidence.*

A. *Claimed error and scope of review.* The defendant complains of the prosecution's disclosure for the first time during trial of several items of evidence: (1) additional footage and sound in the videotape made of the police investigation of the crime scene; (2) 270 questionnaires returned by potential witnesses; and (3) 54 additional witness statements. Piper claims the court should have granted his motion for mistrial or his motion to dismiss on the basis of these late disclosures.

We review the court's ruling on these motions for an abuse of discretion. *See State v. Dixon*, 534 N.W.2d 435, 439 (Iowa 1995) ("A trial judge has considerable discretion to declare a mistrial after a procedural error has occurred during a trial and we will not reverse the court's decision absent a finding of abuse of discretion."); *State v. Henderson*, 537 N.W.2d 763, 765–66 (Iowa 1995) (noting same standard of review for dismissal ruling under Iowa Rule of Criminal Procedure 27(1) (now rule 2.33(1)). This court will not find an abuse of discretion "unless the defendant shows that the trial court's discretion was exercised on grounds clearly untenable or clearly unreasonable." *Henderson*, 537 N.W.2d at 766. An "untenable" reason is one that lacks substantial evidentiary support or rests on an erroneous application of the law. *See State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001).

The defendant also claims the State's late disclosures violated his right to due process under the Fourteenth Amendment because they prevented him from receiving a fair and impartial trial. *See State v. Siemer*, 454 N.W.2d 857, 861 (Iowa 1990) (stating "a fair trial by an impartial tribunal is the most essential requirement

of due process"). We review this constitutional challenge de novo. *Fryer v. State*, 325 N.W.2d 400, 407 (Iowa 1982).

B. *Procedural background.* During jury selection, the State informed the defense it had discovered that the original videotape of the crime scene made by law enforcement during their initial investigation was different in two respects from the copies of the crime scene tape used by the parties during the course of the prosecution. In contrast to the copies possessed by the prosecutors and defense counsel, the newly discovered tape contained sound and additional footage of the investigators "super gluing" the victim's body for fingerprints. (The record shows the prosecutors did not know the original tape had sound or that the fingerprinting had been filmed until the first day of trial.) The audio revealed the investigators using "gallows" humor at the crime scene and was useful to the defense only to the extent it could be employed on cross-examination of the investigators to make them appear insensitive. As for the additional footage showing body fingerprinting, the defense already knew the body had been unsuccessfully fingerprinted, and defense counsel had previously been provided still photographs of the process.

In response to the prosecution's production of the original videotape, the defendant requested a mistrial or dismissal of the charges under Iowa Rule of Criminal Procedure 27(1) (now rule 2.33(1)), claiming the late disclosure was prejudicial. The State asserted the newly discovered audio was not harmful to the defendant and could actually be used to his advantage in cross-examination of the investigators. As for the additional footage, the State argued it revealed nothing the defense did not already know. The court took the matter under advisement and the trial proceeded.

Subsequently, one of the State's witnesses revealed in his testimony that the investigators had sent questionnaires to over 750 hotel guests and employees asking if they had information regarding Lange's death. The defense had been provided only twenty of the responses, although defense counsel always knew, according to the prosecution, that all returned questionnaires were available for his review at the West Des Moines police station. The court ordered the State to immediately make available to the defendant all responses that had been received by the investigators.

Upon learning that 270 questionnaires had been returned, the defendant filed a motion to dismiss, claiming his defense had been hampered. Specifically, he claimed additional discovery was now necessary because one of the responses was from Lange's boyfriend, who had already testified, and another was from a hotel employee who stated she had seen a woman matching Lange's description on August 22, 1993, in the company of other individuals. Piper also renewed his request for a mistrial based on the late disclosure of the original videotape.

The State disputed the defense was prejudiced. It noted that since disclosure of the original tape, prosecutors had made witnesses available for deposition and were willing to provide additional witnesses. The prosecution also pointed out that a purported discrepancy between the boyfriend's testimony and his questionnaire responses was minor and the interview report of the hotel employee who thought she saw the victim on the night of the murder stated that when the employee was shown a picture of Lange, she said she was "quite sure" that was not the woman she had seen.

Two days later, the trial court overruled the defendant's motion for mistrial and motion to dismiss based on the late production of the original videotape. In an effort to avoid any prejudice to the defense, however, the court ruled (1) the defendant could conduct additional discovery related to the newly revealed matters at the State's expense, and (2) upon the defendant's request, the court would grant periodic recesses during trial. The State was ordered to make its witnesses available to be deposed or redeposed.

The trial proceeded and, on its fifteenth day, the State produced for the first time fifty-four witness statements, asserting it had just discovered them. The prosecution conceded the defendant was entitled to the statements pursuant to the parties' reciprocal discovery agreement. Without ruling whether the statements were exculpatory, the court granted a two-day recess to allow the defense to review the materials provided by the State.

The trial then proceeded to completion at which time the defendant renewed his motions for mistrial and dismissal. Thereafter, the court denied all posttrial motions.

■■■ C. *Motion for mistrial.* A mistrial is appropriate when "an impartial verdict cannot be reached" or the verdict "would have to be reversed on appeal due to an obvious procedural error in the trial." *Dixon,* 534 N.W.2d at 439–40. Here, the defendant sought a mistrial based on the State's late disclosure of evidence. He argues the State's late disclosure increased the length of the trial, put additional strain on the jury, and forced the defense attorneys to conduct discovery when they should have been preparing for trial. Although the trial court realized the State's actions hampered the defense attorneys' preparation efforts, the court concluded the late disclosures did not prejudice the actual presentation of Piper's defense.

We conclude the trial court reasonably determined a mistrial was not required here. In the context of the entire record, the withheld evidence was simply not that important. None of the items at issue exonerated the defendant or even cast doubt on his guilt. Nor does the defendant claim he would have changed his defense strategy had he known of the evidence earlier. Moreover, the trial court allowed additional discovery and granted all recesses requested by the defendant to ensure defense counsel had adequate time for trial preparation. We see no "obvious procedural error" that would have required reversal on appeal.

We also think the trial court reasonably concluded the defendant's right to an impartial verdict was not at risk due to the effect of the discovery delays on the jury: the trial court observed the jurors, was familiar with the burdens placed upon them, and believed their impartiality was not compromised by the stress of the trial. We hold the district court did not abuse its discretion in refusing to grant a mistrial.

■ D. *Motion to dismiss.* The defendant sought dismissal under rule 2.33(1), which permits the trial court to dismiss a pending criminal prosecution "in the furtherance of justice." Iowa R.Crim. P. 2.33(1). "Furtherance of justice" encompasses justice to society as well as justice to the defendant. *State v. Lundeen,* 297 N.W.2d 232, 235 (Iowa Ct.App. 1980). Thus, in ruling on such a motion, a district court should consider "the substantive rights of the defendant *and* the interests of the state" in deciding whether to dismiss a case. *State v. Brumage,* 435 N.W.2d 337, 341 (Iowa 1989) (emphasis added).

In *Brumage,* we cited with approval several cases where dismissals had been deemed proper. For example, in *People v. Superior Court,* 69 Cal.2d 491, 72 Cal. Rptr. 330, 446 P.2d 138, 147 (1968), a dismissal was held appropriate to avoid the harassment of a retrial where the evidence was insufficient to prove the defendant's guilt and the prosecution had no additional evidence to introduce at a new trial. In *State v. Witt,* 572 S.W.2d 913, 916–17 (Tenn.1978), a dismissal was affirmed where three prior error-free trials had resulted in deadlocked juries, and there was no reason to expect a different result in a fourth trial. A dismissal was also upheld in *People v. Dewberry,* 40 Cal.App.3d 175, 114 Cal.Rptr. 815, 822 (1974), where evidence essential to proving the defendant's guilt would have to be excluded upon any retrial. In each of these cases, for one reason or another, a retrial held little promise of advancing the cause of justice; therefore, dismissal, as a more reasonable alternative to mistrial, was appropriate.

■ The unusual facts of these cases suggest that dismissal will not be an appropriate remedy in the overwhelming majority of cases. As we aptly observed in *Brumage,* the court's power to dismiss a case in the furtherance of justice "should be 'exercised sparingly' and only in that 'rare' and 'unusual' case where it 'cries out for fundamental justice beyond the confines of conventional consideration.'" *Brumage,* 435 N.W.2d at 340 (citation omitted). To assist a trial court in determining whether a given case is one of those rare and unusual cases that demands dismissal, we have identified several nonexclusive circumstances that may be considered:

(1) weight of the evidence of guilt or innocence; (2) nature of the crime involved; (3) whether defendant is or has been incarcerated awaiting trial; (4) whether defendant has been sentenced in a related or similar case; (5) length of such incarceration; (6) possibility of harassment; (7) likelihood of new or ad-

ditional evidence at trial; (8) effect on the protection to society in case the defendant should actually be guilty; (9) probability of greater incarceration upon conviction of another offense; (10) defendant's prior record; (11) the purpose and effect of further punishment; and (12) any prejudice resulting to defendant by the passage of time.

*Id.*

When we look at these factors in the context of this case, we conclude the trial court reasonably determined dismissal was not warranted. The defendant was being prosecuted for a very serious crime—first-degree murder—warranting life imprisonment without the possibility of parole. Evidence linking the defendant to Lange's murder was compelling. Piper's DNA was identified in seminal fluid found on the bedspread in Lange's hotel room and on a sock found on the floor near her body. In addition, Piper could not be eliminated as the source of semen taken from the victim's vagina.[1] The defendant's DNA also matched the DNA of a pubic hair found on a sock discovered under Lange's body to the exclusion of 99.64% of the population. In addition to the DNA evidence, the prosecution showed that prior to Lange's murder Piper had worked at the hotel as chief engineer and head of maintenance. In this position, he had an "E" key, allowing him entry into any room in the hotel and enabling him to override deadbolt locks. The defendant's access was particularly important because the investigators had found no evidence of forced entry into Lange's hotel room. Given the strong evidence of Piper's guilt, it would not have furthered the interests of society to dismiss the case against him.

Looking at the issue from the defendant's perspective, we do not think dismissal was necessary to ensure justice for Piper. As noted above, the evidence belatedly produced by the prosecution was not that important. Piper's defense was that the semen found in Lange's room came from his earlier sexual encounters with a hotel housekeeper, Heidi Morris. He also suggested that the police had set him up. In view of the weak relevancy of the withheld evidence to Piper's defense, we conclude the State's actions did not prejudice the defendant's ability to present his defense and have it fairly considered by the jury.

The trial court's judgment that this case was not one of those exceptional cases calling for dismissal was reasonable and well supported by the record. Accordingly, the trial court did not abuse its discretion in refusing to grant the defendant's motion to dismiss.

■■■ E. *Constitutional right to fair trial.* The defendant also claims the late evidentiary disclosures violated his due process right to a fair trial. To show a due process violation, the defendant must prove "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt." *State v. Veal,* 564 N.W.2d 797, 810 (Iowa 1997) (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963)), *overruled in part on other grounds by State v. Hallum,* 585 N.W.2d 249, 253 (Iowa 1998). In our de novo review of Piper's due process claim, we conclude he

1. Expert witnesses for the State testified that due to the small quantity of the vaginal sample and degradation of that sample between 1993 and 2000 only a partial profile of the DNA foreign to Lange could be made. At every site where a profile could be obtained, Piper's DNA matched. Thus, he could not be excluded as the source of the DNA found in Lange's vagina.

has failed to show the evidence in question was suppressed or that it was material.

 Evidence is not considered suppressed in a constitutional sense " 'if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence.' " *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003) (citation omitted). Here, to the extent there was any benefit to be had from the evidence that was not disclosed in a timely manner, the defendant was able to effectively use this evidence at trial. The defense exploited the insensitive comments made by the investigators for impeachment purposes. In addition, the defense always knew the essential fact that there had been an unsuccessful attempt to obtain fingerprints from the victim's body; the additional footage added nothing new to this knowledge. Therefore, if this fact was of any help to the defendant, he knew of it in time to take advantage of it at trial.

 The same may be said for the returned questionnaires and witness statements. These materials were available to the defendant during trial. The State offered the assistance of law enforcement to locate any questionnaire respondents the defendant wanted to interview. In addition, the court allowed recesses to provide time for the defense to conduct additional discovery and to facilitate defense counsel's assimilation of the new materials; it granted the defendant permission to recall any of the State's witnesses for additional cross-examination; it placed no limitations on the evidence the defendant could present in surrebuttal; and it required the State to pay the costs of additional discovery, including the defendant's attorney fees. Piper has not identified any accommodation needed by his defense team in order to exploit the newly revealed evidence that the court denied.

 Even if we accept Piper's claim that the evidence was suppressed, he has failed to demonstrate this evidence was material. "Evidence is material when there is a 'reasonable probability' that disclosure would have changed the result of the proceeding." *Veal*, 564 N.W.2d at 810 (citation omitted). As we observed in our discussion of the mistrial issue, the defendant has pointed to nothing in the three categories of materials disclosed during trial that would have called his guilt into question or changed his trial strategy. His generalized assertions that the late revelations hindered the defense team's trial preparation and put a strain on the jury are insufficient to establish a reasonable probability of a different outcome. Thus, while the late disclosures disrupted the trial and were concededly a frustration to and burden on the defense, we do not think they deprived the defendant of a fair trial.

III. *Error in Allowing Evidence of Defendant's Extramarital Affair.*

A. *Challenged evidence.* The State called as a witness the defendant's neighbor, Diane Ellis, who testified she had an intimate relationship with Piper from 1996 through 1998. Ellis stated that after the police interviewed her in 2000, the defendant demanded that she change her story, threatening to "drag [her] family through the mud" if she did not. She also testified Piper told her he was innocent and explained that his DNA was in the hotel room where Lange was found because "he had sex in the room six months before [Lange] was killed."

In addition to this evidence, an investigator testified Piper told him in 1999 that the only extramarital affair Piper had had was with Morris, the hotel employee. According to the investigator, when Piper

was interviewed in 1999, Piper did not recall having sex with Morris in the hotel.

B. *Issue and arguments of parties.* Piper claims evidence of his affair with Ellis should not have been admitted because (1) it was not relevant; and (2) to the extent it was relevant, any probative value of this evidence was outweighed by its prejudicial effect. *See* Iowa Rs. Evid. 5.403, .404(*b*). The State asserts Ellis's testimony was relevant to establish Piper's consciousness of guilt. In addition, the State claims this testimony undermines the defendant's alibi, which rested primarily on the testimony of his wife. The State suggests that Piper's ability to carry on a lengthy extramarital affair with his next-door neighbor without his wife's knowledge calls into question the accuracy of his wife's testimony accounting for Piper's whereabouts during the time Lange was murdered.

Although the court allowed testimony concerning the defendant's affair with Ellis to show the defendant tried to mislead investigators and was "capable of leaving his wife's presence and ... doing something without her knowing it," the court ruled that the witnesses could not talk about the details of the Ellis affair. We review this ruling for an abuse of discretion. *See Rodriquez,* 636 N.W.2d at 239.

■ C. *Applicable legal principles.* Iowa Rule of Evidence 5.404(*b* ) provides that evidence of other acts by the defendant may not be used to prove the character of the defendant or that he acted in conformity with such other acts. This type of evidence may be admitted, however, if it is relevant to prove some fact or issue other than the defendant's character or predisposition to act in that manner. *See id.* If the evidence is relevant for a legitimate purpose, then Iowa Rule of Evidence 5.403 requires the court to assess whether its " 'probative value is substan-

tially outweighed by the danger of unfair prejudice.' " *Id.* (quoting Iowa R. Evid. 5.403). In balancing probative value against unfair prejudice, the court may weigh the prosecution's need for the evidence, how certain it is that the defendant actually committed the other acts, and how strongly the evidence supports the relevant issue, against the degree to which the jury will be motivated to find the defendant guilty based on its desire to punish the defendant for his other acts rather than based on the State's proof the defendant committed the crime charged. *Id.* at 240. Even if a defendant can establish that evidence was erroneously admitted, reversal is not required unless a substantial right of the defendant is affected. Iowa R. Evid. 5.103(a).

■ D. *Discussion.* We agree with the trial court's conclusion that the challenged evidence was relevant. Piper's conversation with Ellis shows a consciousness of guilt by establishing Piper had attempted to mislead the investigators, first by lying to them in 1999 with respect to having sex with Morris in the hotel, and later by asking Ellis to lie to the police. *See State v. Lasage,* 523 N.W.2d 617, 621 (Iowa Ct.App.1994) ("An intentional untruth can be an indication of consciousness of guilt."). Evidence with respect to the nature of Ellis's relationship with Piper was necessary to put her conversation with him in context. We also agree with the district court that the challenged evidence had some tendency to undermine the reliability of the alibi testimony given by the defendant's wife.

■ In weighing the value of this evidence against its unfair prejudice, we observe there was some need for the testimony of Ellis and the investigator in light of the issues in the case. Although the prosecution had proof that Piper's semen was

on the bedspread where Lange was found and on a sock found by the bed, he claimed at trial the presence of his semen was explained by his affair with Morris. This defense was weakened, however, by evidence that he was trying to mislead the investigators, indicating he had something to hide. Piper's other primary defense was his alibi. Therefore, evidence that would call into question the reliability of his wife's testimony that she knew where he was during the time Lange could have been murdered was important. In addition to the actual usefulness of the testimony, the trial court could properly have considered the fact that Piper did not deny the prior act, namely, that he had an affair with Ellis.

Weighed against these considerations was the fact the jury already knew Piper was a philanderer. From the time of opening statements, Piper offered his affair with Morris to neutralize one of the most incriminating pieces of evidence against him—the presence of his DNA on the bedspread of Lange's hotel room. Thus, his very innocence depended on the jury's belief that he had an extramarital affair. Moreover, Morris had already testified extensively regarding Piper's infidelity, testimony much more damaging to his character than anything Ellis later revealed.[2] Under these circumstances, the degree of prejudice resulting from evidence that the defendant had an affair with Ellis could hardly be deemed significant.

For these reasons, we think the trial court reasonably concluded any unfair prejudice flowing from the jury's knowledge of the Ellis affair did not substantially outweigh the probative value of this evidence. This conclusion enjoys substantial support in the record. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

IV. *Admission of Evidence Over Defendant's Chain–of–Custody Objection.*

▮▮▮ A. *Guiding principles.* When the State seeks to have physical evidence taken from the crime scene admitted at trial, it must offer sufficient proof "that the exhibits offered into evidence were the same as those taken, and their contents were in the same condition when analyzed and introduced as when taken." *State v. Perry*, 246 Iowa 861, 869–70, 69 N.W.2d 412, 417 (1955). This foundational requirement is generally met by showing the continuous custody of the exhibit was such as to render it improbable that anyone tampered with the original item or substituted a different item. *State v. Gibb*, 303 N.W.2d 673, 681 (Iowa 1981); *State v. Bakker*, 262 N.W.2d 538, 542–43 (Iowa 1978). The sufficiency of such a showing depends in some part on the nature of the exhibit, a more stringent chain of custody being necessary when the evidence is of a type more susceptible to alteration or substitution. *Bakker*, 262 N.W.2d at 543. The prosecution is assisted in establishing the required foundation by a presumption that "State agents would not tamper with the evidence." *Gibb*, 303 N.W.2d at 681.

---

**2.** Ellis testified there was no violence in her consensual relationship with Piper and that he was generally a soft-spoken man. In contrast, Morris testified that Piper badgered her for sex, and touched her in an unwelcome, sexual manner while she tried to work. She said she agreed to have sex with him, but there was nothing "sexy or romantic" about their sexual encounters. Morris also testified that Piper appeared at her bedside in her home one night, unannounced and uninvited. She said she was shocked because she had locked the door before retiring. Morris noted, however, "I don't think there's anything he couldn't get in and out of."

"Admission of evidence over a chain-of-custody objection is a matter within [the] trial court's discretion." *Id.* Once the court has determined an adequate foundation has been laid, any doubt that the exhibit is what it purports to be goes to the weight of the evidence. *Id.* at 682.

B. *Procedural background.* In the present case, the defendant objected to the admission of three exhibits offered by the prosecution on the basis the State had not adequately established a chain of custody for these items: (1) a microscopic slide containing a mounted pubic hair found on a sock taken from underneath the victim's body; (2) a pair of white socks found near the victim's body stuck together with feces and containing semen; and (3) a small portion of a vaginal swab taken from the victim in 1993, that had been sent to a DNA testing agency and later returned to the police. Despite what the trial court characterized as some "confusion" with respect to the custody of these items, it concluded the State had sufficiently explained any discrepancies in the chain of custody and had adequately dispelled any concerns of contamination. We review this ruling for an abuse of discretion. *Id.* at 681.

C. *Discussion.* The common thread between the three exhibits at issue is that they each contained DNA the State linked to Piper in varying degrees. The defendant suggests that since these exhibits contained DNA a more precise chain-of-custody showing was necessary because DNA can be easily substituted or contaminated. We reject the defendant's attempt to categorize all evidence containing DNA in the same manner. The degree of detail required in the chain of custody so as to render alteration or substitution improbable depends on the form of the exhibit as well as the fact the exhibit contains DNA. We turn, then, to the specific exhibits ad-mitted over the defendant's chain-of-custody objection.

The defendant criticizes the prosecution's chain of custody with respect to the pubic hair slide and the socks, claiming these items were not always in the State's possession. The record shows the pubic hair and socks were collected from the crime scene by State criminologist Paul Bush, who subsequently affixed the pubic hair to a slide with mounting medium on August 25, 1993. In December 1993 the exhibits in the case, including the slide and the socks, were checked out to the West Des Moines police department. According to a routing sheet, the exhibits were returned to Bush in 1999, when the murder investigation was rekindled. He testified he found them in the same condition in 1999 as in 1993. Upon receiving the slide in 1999, Bush had to chip away the mounting medium to access the pubic hair for testing—testing that ultimately revealed Piper as the probable source for the hair.

The only wrinkle in the chain-of-custody showing with respect to these items was an incident that occurred while the exhibits were in the custody of the West Des Moines police. In 1994 the police released several personal items collected during the investigation to Gary Lange, the victim's brother. The paperwork documenting this release showed exhibit AO, which contained the slide, and exhibit AV, which contained the socks, were given to Gary. Although Gary initialed the form listing these items, he testified at trial he had never received them. He said that, upon returning home after picking up his sister's personal effects, he prepared his own inventory of the items he had obtained from the police and realized his list did not match the list prepared at the station. In particular, his inventory did not include exhibits AO and AV. Gary testified he was sure he had not received any socks

with feces, as he would have remembered such an event because it would have been upsetting to him. Gary said he called the police department to report the discrepancy between the police form and what he had received. A detective with the police department confirmed at trial that he had talked to Gary Lange in 1994 about the items erroneously listed as being released to the family.

We conclude this testimony adequately supports the trial court's determination that the State accounted for the continuous custody of the slide and socks and eliminated any reasonable probability of tampering with this evidence. Any contrary determination would have to be premised on a belief that either the authorities or Gary Lange, assuming he ever had these exhibits, had the opportunity and motivation to substitute Piper's pubic hair and feces-encrusted socks stained with Piper's seminal fluid for the original exhibits. The defendant has yet to propose how these individuals would have obtained his pubic hair and semen so as to make such a substitution even possible. Clearly, the trial court did not abuse its discretion in rejecting the defendant's challenge to these exhibits.

 That brings us to the final piece of evidence for which Piper claims an adequate foundation is lacking—the vaginal swab taken from the victim. The record shows Bush collected four vaginal samples from Lange's body at the crime scene, which were subsequently stored at a state laboratory. A routing sheet shows the swabs were mailed to Cellmark Diagnostics in Maryland for testing in February 1994. In June 1994 Cellmark returned the swabs in the original packaging and the swabs were placed in cold storage. Three months later Bush received from Cellmark a sample that it had taken from one of the vaginal swabs, marked with Cellmark's

case number for the Lange investigation and labeled "FTS1" (future testing sample). Bush, unaware of the significance of the package, simply placed it in the freezer with the other Lange evidence stored there. The State did not realize it still had a testing sample from the swabs until Piper's first trial when a Cellmark witness informed the State that Cellmark had not consumed all the vaginal swab evidence in its testing. In fact, it was the discovery of this sample that precipitated the mistrial in the defendant's first trial.

The defense criticizes the State's chain-of-custody showing for the vaginal swab sample because, according to the defendant, "no one testifies where, who and how this exhibit ends up in the DCI lab's freezer" and it was not until the first trial that it was discovered. Piper claims, therefore, that the State cannot show a reasonable probability that the sample has not been contaminated or altered.

The trial court rejected the defendant's argument and we think correctly so. It was uncontroverted that Cellmark sent FTS1 to Bush in 1994 and that this sample was jointly retrieved by counsel for the parties in 2000. The trial court reasonably concluded FTS1 remained untouched in relative obscurity in the DCI freezer from 1994 until its retrieval. There was no evidence to suggest any tampering, alteration or substitution of FTS1 during this time. The State's failure to appreciate the significance of the second envelope sent by Cellmark in 1994 does not undermine the evidence of its safekeeping during the following years. We hold the trial court did not abuse its discretion in admitting this evidence.

## V. Removal of Juror.

A. *Background facts.* Upon completion of the evidence, but before closing arguments, the parties learned that a juror

had been involved in a conversation with her hairdresser the night before during which the hairdresser attempted to talk to the juror about the Piper murder trial. Despite the juror's statement to the hairdresser that she was not allowed to talk about the trial, the hairdresser said that Nan Horvat, one of the prosecutors, was also a client of the hairdresser. The hairdresser then informed the juror that Ms. Horvat was married to an attorney and had a two-year-old child. The juror told her hairdresser that she did not want to talk about Ms. Horvat, and the conversation then turned to other matters.

Piper objected to the juror and so the court questioned the juror privately after closing arguments were made. The court learned that the juror was receiving a permanent at the time of the ill-advised conversation and consequently was not in a position to avoid the hairdresser's comments. In addition, the juror had taken her glasses off for the perming process, rendering her "blind as a bat," so she had not observed the facial expressions of the hairdresser. The juror stated she did not have a close relationship with the hairdresser and the conversation would have no effect upon her opinion of the case. In addition, there was no evidence she had shared the information volunteered by the hairdresser with any other juror. Based on its investigation, the court denied the defendant's request to replace the juror with an alternate.

■■■ B. *Governing law.* The defendant claims he is entitled to a new trial based on the court's refusal to remove the juror at issue from the case. "[C]onduct by an outsider, improperly influencing a juror, can be grounds for a new trial." *State v. Anderson,* 448 N.W.2d 32, 34 (Iowa 1989). The mere receipt of information outside the record will not, however, require this relief. There must be "a rea-

sonable probability that the misconduct did in fact influence the jury in its deliberations." *Id.* Moreover, an assessment of the risk of improper influence rests on "objective facts as to what actually occurred in or out of the jury room," not on speculation about what might have happened. *State v. Johnson,* 445 N.W.2d 337, 341 (Iowa 1989). The trial court possesses broad discretion in determining whether jurors have considered matters outside the record so as to warrant a new trial. *Id.* at 340.

■■ C. *Discussion.* We do not think the trial court exercised its discretion unreasonably in this case. The defense asserts information that the prosecutor was married and had a child, as well as the fact a juror and the prosecutor shared the same hairdresser, "would tend to bolster the prosecutor's credibility," thereby improperly affecting the jury's consideration of the case. But as the State points out, "[t]he information that a prosecutor might have a family is not shocking news, and is no different than information imparted casually and routinely by lawyers during voir dire." In fact, the defendant's own attorney told the jury panel that he had children. Similarly, the mere employment of the same hairdresser by a juror and a prosecutor was not a significant circumstance. The trial court was well within its discretion in concluding there was no reasonable probability the jury was in fact influenced in its deliberations by this information or by knowledge of the prosecutor's family situation.

VI. *Coercion of Jury's Verdict.*

A. *Background facts.* The defendant claims error in the trial court's refusal to declare a mistrial after the jury indicated it was unable to reach a verdict. The record shows the jury had deliberated for three full days and two half days when it

sent a note to the judge stating, "We are a hung jury. Ten guilty; two not guilty." A second note a few minutes later clarified that one of the two "not guilty" votes was more accurately a "not sure" vote.

Upon learning of these communications, the defense asked the court to refer the jury to the instructions and particularly to instruction no. 38.[3] Defense counsel also requested that the court ask the jury if it was hopelessly deadlocked or whether continued deliberations would be of any value. In response to the jury's notes, the court referred the jury to instruction no. 38, along with the remaining instructions, and ordered that the jurors continue to deliberate.

Four hours later, the defendant moved for a mistrial, contending the jurors who had not yet voted "guilty" would be pressured by the other jurors to change their votes in order to reach a verdict. The court denied the motion and a similar motion made the following morning. The court believed the length of the jury's deliberations at the time it contacted the judge (almost twenty-eight hours) was not unreasonable considering the trial lasted for six weeks, including seventeen days of testimony, the evidence was complex, and the first-degree-murder charge submitted

to the jury was a serious matter. Two hours after the court denied the defendant's second motion for mistrial the jury returned a unanimous guilty verdict.

B. *Applicable legal principles.* The defendant asserts his Sixth Amendment right to a fair trial and his Fourteenth Amendment right to due process were violated by the court's actions, which the defendant claims coerced the jury into returning a verdict. We review these constitutional claims de novo. *State v. Martin,* 608 N.W.2d 445, 449 (Iowa 2000). We review the defendant's related claim that the trial court should have granted a mistrial for an abuse of discretion. *See State v. Campbell,* 294 N.W.2d 803, 808–09 (Iowa 1980).

Supplemental instructions urging a jury to reach a unanimous verdict have "long been sanctioned." *Lowenfield v. Phelps,* 484 U.S. 231, 237, 108 S.Ct. 546, 550, 98 L.Ed.2d 568, 577 (1988). In fact, this court approved such an instruction in substantially the form given in this case in *Campbell,* 294 N.W.2d at 812. Nonetheless, the content of this type of instruction is only one factor to consider in determining whether the jury was improperly coerced. The supplemental charge must

---

3. Instruction no. 38 stated:

When you begin your deliberations, you should select a foreperson. He or she shall see that your deliberations are carried on in an orderly manner, that the issues are fully and freely discussed, and that every juror is given an opportunity to express his or her views.

In order to return a verdict, each juror must agree to it. Your verdict must be unanimous.

It is your duty as jurors to consult with one another and reach an agreement, if you can do so without compromising your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with the other jurors.

During your deliberations, do not hesitate to re-examine your view and change your opinion if convinced it is wrong. But do not change your opinion as to the weight or effect of the evidence just because it is the opinion of the other jurors or for the mere purpose of returning a verdict.

Your attitude at the beginning of your deliberations is important. It is not a good idea for you to take a position before thoroughly discussing this case with the other jurors. If you do this, individual pride may become involved and you may later hesitate to change an announced position even if shown it may be incorrect. Remember, you are not partisans or advocates but are judges—judges of the facts. Your sole interest is to find the truth and do justice.

be evaluated " 'in its context and under all the circumstances.' " *Lowenfield,* 484 U.S. at 237, 108 S.Ct. at 550, 98 L.Ed.2d at 577 (citation omitted). In *Lowenfield,* the court identified other factors that might suggest a coercive effect: an inquiry into the jury's numerical division, a speedy verdict after receiving the supplemental instruction, and language instructing the jury it must make a decision. *Id.* at 239–40, 108 S.Ct. at 551–52, 98 L.Ed.2d at 578–79; *accord State v. Cornell,* 266 N.W.2d 15, 20 (Iowa 1978) (noting five-hour period between supplemental instruction and verdict indicated jury was not coerced into rendering a decision).

■ C. *Application of law to this case.* As we have already noted the content of the instruction given here was not objectionable. In addition, neither the instruction nor anything stated by the court to the jury indicated the jury was required to reach a verdict. Moreover, the court did not inquire into the voting breakdown, albeit that information was volunteered by the foreperson in the notes sent to the trial judge.

■ Finding nothing expressly coercive in the written or oral communications with the jury, the defendant focuses most specifically on the length of time spent by the jury in deciding the case after receiving the supplemental instruction, arguing it supports a finding of coercion. He contends that any verdict rendered by a jury in excess of four hours after receiving a supplemental instruction is per se coerced. We disagree. Initially, we note that the length of deliberations must be considered in the context of the entire case in deciding whether the jury was unfairly coerced into returning a verdict. Under the circumstances of this case, we do not think the jury was forced to reach a decision.

Although it is difficult to determine exactly how long the jurors deliberated after the court's reference to instruction no. 38, it appears they considered the case for an additional ten to eleven hours, including lunch breaks. Given the complexity and sheer volume of evidence, this period seems to be a reasonable amount of time for the jurors to take to reexamine their positions. Contrary to the defendant's contention that the length of time indicates coercion, we think it is indicative of the jurors' careful reconsideration of the evidence. Other courts have suggested coercion more likely occurs when the jury returns a verdict *shortly* after receiving a supplemental instruction, which is not the situation here. *E.g., Lowenfield,* 484 U.S. at 240, 108 S.Ct. at 552, 98 L.Ed.2d at 579; *United States v. Cook,* 663 F.2d 808, 811, n. 4 (8th Cir.1981); *Kociemba v. G.D. Searle & Co.,* 707 F.Supp. 1517, 1532–33 (D.Minn.1989).

■ The defendant also argues that the overall length of the deliberations in this case—eleven days—combined with "prosecutorial misconduct" that lengthened the trial, intensified the "enormous personal strain and pressure on the jury" to the point where the jurors felt compelled to reach a verdict. Although the jurors' time commitment in this case was substantial, there is no indication in the record that the court failed to adequately provide for their physical needs and comfort. *See State v. Kelley,* 161 N.W.2d 123, 126 (Iowa 1968) ("Although the jury deliberation was quite long [twenty-four hours], there is no suggestion its physical needs and comfort were not adequately provided for."). The jury never informed the court after receiving the supplemental instruction that it was having trouble reviewing the evidence or reaching a verdict. Moreover, the jury was able to enjoy a three-day holiday weekend as well as a two-day weekend break during the course of its deliberations, which would have refreshed

the jurors' energy and renewed their ability to thoughtfully consider the evidence in deciding the case. We do not think, as the defendant suggests, that the only possible outcome of such lengthy deliberations is a guilty verdict.

In summary, the facts and circumstances do not support a finding that the jury's verdict was coerced. Consequently, we hold the defendant was not denied due process or a fair trial by the court's handling of the jury's deliberations. In addition, the trial court did not abuse its discretion in refusing to grant the defendant a mistrial based on the length of the jury's journey to a verdict.

### VII. Claim of Prosecutorial Misconduct.

To prevail on a claim of prosecutorial misconduct, a defendant must establish that misconduct occurred, and that he was so prejudiced by the misconduct that he was deprived of a fair trial. See State v. Bowers, 656 N.W.2d 349, 355 (Iowa 2002); State v. Greene, 592 N.W.2d 24, 30–31 (Iowa 1999). Thus, it is the prejudice resulting from misconduct, not the misconduct itself, that entitles a defendant to a new trial. Greene, 592 N.W.2d at 31. In determining whether prosecutorial misconduct warrants a new trial, the court should consider such misconduct within the context of the entire trial, including the court's instructions. Id. at 32. Whether the misconduct was isolated or pervasive, and the strength of the evidence against the defendant are appropriate considerations for the trial court. State v. Belken, 633 N.W.2d 786, 802 (Iowa 2001); Greene, 592 N.W.2d at 32. The court's ruling on a request for a new trial based on prosecutorial misconduct is discretionary. State v. Jacobs, 607 N.W.2d 679, 689 (Iowa 2000).

The defendant here asserts four instances of alleged prosecutorial misconduct: (1) late disclosure of evidence; (2) improper playing of a tape recording of a conversation between an investigator and Piper; (3) improper vouching during closing argument for the State's credibility with respect to the original crime scene videotape; and (4) improper questioning during defendant's cross-examination concerning his ability to have experts review the evidence. We have already addressed the situation involving the State's late disclosure of evidence. After a thorough review of the record, we conclude the trial court reasonably concluded the late disclosures did not deprive the defendant of a fair trial.

With respect to the remaining claims, we hold the defendant has not preserved error. In order to preserve error for appeal, defense counsel must challenge the prosecutor's actions at trial. See State v. Rutledge, 600 N.W.2d 324, 325 (Iowa 1999). Here, the defendant has not identified in his brief where in the record these alleged instances of prosecutorial misconduct were brought to the attention of the trial court. See Iowa R.App. P. 6.14(1)(f) (stating appellant must state in brief "how the issue was preserved for review, with references to the places in the record where the issue was raised and decided"). Therefore, Piper has not demonstrated that the remaining claims of prosecutorial misconduct were preserved for our review.

In addition, the defendant has merely presented these claims on appeal in one-sentence conclusions without analysis. Although he refers the court to the record where, he says, he "made extensive arguments during the trial regarding the specific claims," our review of the portions of the record cited by the defense does not advance our understanding of the nature and scope of the defendant's argument on appeal. We conclude Piper has waived

any argument with respect to these issues as any consideration of the merits of the defendant's complaints by this court on appeal would require the court "'to assume a partisan role and undertake the [defendant's] research and advocacy,'" a task we will not accept. *State v. Stoen,* 596 N.W.2d 504, 507 (Iowa 1999) (citation omitted).

## VIII. *Instructional Error.*

A. *Issues and scope of review.* Piper makes several claims of error by the trial court in its instruction of the jury: (1) instructing on sexual abuse as an element of first-degree murder in the absence of supporting evidence; (2) erroneously instructing the jury that it had nothing to do with punishment; (3) refusing the defendant's request to read the "not guilty" verdict form before the "guilty" verdict form; (4) refusing the defendant's request for a chain-of-custody instruction; (5) failing to instruct the jury on the reason for the numerous delays during trial; and (6) refusing the defendant's requested instruction on imputed knowledge with respect to law enforcement's possession of the evidence not produced until trial.

■ Our review of alleged instructional error depends on the nature of the supposed error. *Compare State v. Walker,* 600 N.W.2d 606, 608 (Iowa 1999) ("Challenges to jury instructions are reviewed for correction of errors of law."), *with State v. Langlet,* 283 N.W.2d 330, 336 (Iowa 1979) (reviewing court's refusal to give an "inference instruction on alleged spoliation" for an abuse of discretion). Any error with respect to the court's instruction of the jury will not support reversal unless the defendant shows prejudice. *State v. Webb,* 516 N.W.2d 824, 831 (Iowa 1994).

■ B. *Sexual abuse.* The jury was instructed that one element of first-degree murder was the defendant's participation in the forcible felony of willful injury or sexual abuse. *See* Iowa Code §§ 707.2(2) (stating murder is in the first degree when the killing occurs during a forcible felony), 702.11 (defining "forcible felony" to include certain forms of sexual abuse). The court further instructed the jury that sexual abuse is committed "by performing a sex act by force or against the will of the victim." The instruction also included the statutory definition of "sex act." *See id.* § 702.17 (defining "sex act"). We review the defendant's claim that these instructions were not supported by substantial evidence for correction of errors of law. *Walker,* 600 N.W.2d at 608.

■ Contrary to the claims of the defendant, the record contains ample evidence that a sex act was performed by force or against the will of the victim at the time of the murder. Except for her tennis shoes and socks, Lange was found naked from the waist down, her top and bra pulled up to reveal her breasts. This evidence, together with the semen and male pubic hair found in and around her body, points to the occurrence of a sex act. That such an act was performed by force or against the victim's will is suggested by evidence Lange was bound and gagged and strangled by a coat hangar. Piper's claim that "[t]he record in this case contained no evidence of a sexual assault" is wholly without merit. We conclude the court's instruction on sexual abuse was supported by the evidence.

C. *Jury's role in punishment.* The court instructed the jury: "The duty of the jury is to determine if the defendant is guilty or not guilty. In the event of a guilty verdict, you have nothing to do with punishment." The defendant claims this instruction is incorrect "because a verdict of guilty of murder results in a mandatory

sentence; there is no judicial discretion." We review this claim for correction of errors of law. *Id.*

We first note the court's instruction was a correct statement of the law. This court similarly summarized the jury's role over eighty years ago: "The jury has no concern with the punishment which the law prescribes. Its function is to determine the fact question as to whether the defendant is guilty or not guilty." *State v. Purcell,* 195 Iowa 272, 274, 191 N.W. 849, 850 (1923).

 The court's instruction in essence told the jury that if it found the defendant guilty, it would not determine the defendant's punishment, a fact supported, not undermined, by the mandatory nature of the penalty for first-degree murder. *See generally* Iowa Code §§ 707.2 (making first-degree murder a class "A" felony), 902.1 (imposing life imprisonment for commission of class "A" felony). If the defendant is suggesting the court's instruction would lead the jury to believe its determination of guilt or innocence would have no effect on the defendant's punishment, we find such a suggestion unreasonable. Jurors are simply not that naive. They know that if they find a defendant guilty, he will be punished in some fashion. They also know that the more serious the offense of which the defendant is convicted, the more severe the punishment the defendant will receive. But, as the court instructed, the determination of that punishment does not involve the jury. Because we think the court's instruction was not erroneous and because the jury could not have been misled by the instruction, we find no basis for reversal in this assignment of error.

 D. *Order of the verdict form.* The trial court refused the defendant's request to place the "not guilty" option before the "guilty" alternative in the verdict form. The defendant's rationale for this request was the presumption of innocence: since the defendant is presumed innocent until found guilty, "not guilty" should be the jury's first option. As the particular form of an instruction is left to the discretion of the trial court, 75A Am. Jur.2d *Trial* § 1078, at 608 (1991), we review the court's ruling on the defendant's request for an abuse of discretion. *State v. Zaehringer,* 280 N.W.2d 416, 422 (Iowa 1979); 5 Am.Jur.2d *Appellate Review* § 695, at 365 (1995).

 The jury was instructed that the defendant was presumed innocent and that it must find the defendant guilty beyond a reasonable doubt. Jurors are presumed to follow the court's instructions. *See State v. Proctor,* 585 N.W.2d 841, 845 (Iowa 1998). We do not think the order of the verdict form deprived the defendant of the benefit of the presumption of innocence.

In addition, we reject any implication that the order of the jury's choices would work to the defendant's disadvantage. We do not think the jury would simply sign the first option appearing on the verdict form without considering the evidence presented at trial or the instructions given by the court. We conclude the court did not abuse its discretion in determining the format of the verdict forms.

 E. *Chain-of-custody instruction.* The defendant asked the court to instruct the jury on the requirements for an adequate chain of custody and that, if the jury determined the State had failed to prove a proper chain of custody, the jury could "disregard the evidence or give the evidence less weight." The trial court refused to give this instruction and rightly so. Whether the prosecution has established a proper chain of custody is a decision for the trial court, not the jury. *See State v. Lamp,* 322 N.W.2d 48, 57 (Iowa 1982), *overruled in part on other grounds*

*by State v. Heminover,* 619 N.W.2d 353, 357 (Iowa 2000). Thus, although the defense can argue that an exhibit is not what it purports to be, the defendant is not entitled to a chain-of-custody instruction. *See United States v. Artero,* 121 F.3d 1256, 1259 (9th Cir.1997).

■ F. *Reason for trial delays.* Piper wanted the court to instruct the jury that the reason for the numerous delays during the trial was the prosecution's handling of the evidence. He argued the jury might otherwise hold the defendant responsible for the length of the trial. The trial court refused to give such an instruction.

The court's instructions informed the jury that it was to base its verdict "only upon the evidence and these instructions." The jury was properly instructed on the elements of first-degree murder. Matters such as the length of the trial and a party's responsibility for delay were not relevant to any of the issues properly submitted to the jury. It would be inappropriate for the court to instruct the jury with respect to a matter that the jury should not even consider in reaching a verdict. *See Kurth v. Iowa Dep't of Transp.,* 628 N.W.2d 1, 8 (Iowa 2001) ("The jury should not be informed of any matter which is not proper for it to consider in arriving at its verdict."). Accordingly, the trial court properly refused to address the issue of trial delay in the jury instructions.

G. *Imputed knowledge instruction.* Defense counsel asked the court to instruct the jury that with respect to the evidence not provided to the defense until after commencement of trial, the jury could "determine the prosecutors for the State possessed this evidence from the time the evidence was possessed by law enforcement," citing our decision in *Hamann v. State,* 324 N.W.2d 906 (Iowa 1982). This court stated in *Hamann* that "knowl-

edge on the part of the police within the prosecutor's jurisdiction is attributed to the prosecutor's office." 324 N.W.2d at 909. The defendant has failed to explain how this principle of imputed knowledge relates to any issue submitted to the jury. Therefore, we give this contention no further consideration.

## IX. *Restitution Judgment.*

■ Piper was ordered to pay $150,000 to Lange's estate as restitution pursuant to Iowa Code section 910.3B (2001). He contends this order violated the Ex Post Facto Clauses of the federal and state constitutions. *See* U.S. Const. art. I, § 10; Iowa Const. art. I, § 21. The State concurs.

Section 910.3B was enacted in 1997 and mandates a $150,000 judgment for restitution against a defendant committing a felony that results in the death of the victim. 1997 Iowa Acts ch. 125, § 11 (codified at Iowa Code § 910.3B (Supp.1997)). This court has held the Ex Post Facto Clause is violated by application of this new law to defendants whose crimes were committed prior to its adoption. *State v. Corwin,* 616 N.W.2d 600, 601 (Iowa 2000).

Here, the murder of which Piper was convicted occurred in 1993. Therefore, as the State concedes, the trial court may not constitutionally impose a judgment for restitution under section 910.3B. That part of Piper's sentence must be vacated.

The State does request, however, that we remand this case so that an order of restitution can be entered pursuant to the statutes in effect at the time of Lange's murder, Iowa Code sections 910.2 and 910.3 (1993). These statutes, which remain in the Code, provide for an order of restitution in all criminal cases except certain simple misdemeanors, and specify a procedure for the determination of the

amount of restitution. We agree the trial court should have followed these statutes in setting Piper's restitution obligation in this case. Therefore, this matter must be remanded for a determination of restitution under sections 910.2 and 910.3.

### X. *Summary and Disposition.*

We find no error in the judge's rulings with respect to the various matters raised by the defendant on appeal. It follows, then, that we also find no merit in Piper's contention he was denied a fair trial by the cumulative effect of the court's rulings.

In view of the admitted error in the district court's imposition of restitution pursuant to Iowa Code section 910.3B, we vacate that part of the court's sentence.

We otherwise affirm the defendant's conviction and his sentence to life imprisonment. The case is remanded for correction of the judgment in accordance with this decision.

**JUDGMENT OF CONVICTION AFFIRMED, SENTENCE VACATED IN PART AND AFFIRMED IN PART, AND CASE REMANDED WITH DIRECTIONS.**