# IN THE COURT OF APPEALS OF IOWA

No. 17-0509
Filed March 21, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JUSTIN MICHAEL STICKROD,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Monroe County, Lucy J. Gamon, Judge.

Justin Stickrod appeals from his convictions of first-degree sexual abuse and child endangerment. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Vaitheswaran and Bower, JJ.

**DANILSON, Chief Judge.**

Justin Stickrod appeals from his convictions of first-degree sexual abuse, in violation of Iowa Code sections 709.1 and .2 (2016), and child endangerment, in violation of section 726.6(1)(a), (3), and (5). He contends his trial attorneys were ineffective in several respects.

Our review of constitutional issues, such as claims of ineffective assistance of counsel, is de novo. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

To prevail on an ineffective-assistance-of-counsel claim, a defendant must establish (1) counsel failed to perform an essential duty and (2) the defendant was prejudiced as a result. *State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013). "We usually preserve claims of ineffective assistance of counsel for potential postconviction proceedings. However, if the record is sufficient to decide such claims, we will do so on direct appeal." *State v. Elston*, 735 N.W.2d 196, 200 (Iowa 2007) (citations omitted). "If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001).

On February 4, 2016, Stickrod was home alone with his two-month-old daughter for approximately two and one-half hours while his wife went to a doctor appointment and ran errands. Stickrod was asleep or passed out when she returned.[1] The baby was in a swing wearing only a diaper and was crying in an

---

[1] His wife testified he had passed out the night before after drinking. He was awake at 7:30 a.m. on February 4. His wife stated he was drinking and that he asked her to go out and buy him alcohol. She did so and returned shortly, finding Stickrod sitting on the couch and holding the child. She left the house for her errands about 9:50 a.m.

unusual way. The mother discovered blood in the infant's diaper. She attempted to wake Stickrod but was unable to do so. The mother took the child to the county hospital.

Registered nurse Christine Arauco was the first person to examine the baby girl, observing the child exhibited "mild distress" whimpering and crying. Nurse practitioner Nicole Topliff noted the child's "vaginal opening was gaping" and bleeding. Nurses observed tearing, bruising, redness, swelling, and a small amount of stool in the vaginal area. The child's mother testified a nurse informed her that the child had been sexually abused. Law enforcement was called.

The child was transported by ambulance to Blank's Children's Hospital. Sexual assault nurse examiner Shannon Knudsen and Dr. Kenneth McCann examined the baby upon arrival at Blank and observed redness, swelling, bruising, and bleeding of the external genitalia with bilateral lacerations of the hymen and posterior fourchette. They also observed stool in the vaginal vault. Dr. McCann explained that infection is a major concern with such tissue damage because bacteria in that area of the body can easily enter the blood stream and cause a potentially fatal blood infection. Dr. McCann's concern about the extent of internal injuries prompted him to call in a pediatric surgeon to examine the baby under anesthesia. Both the nurse and doctor opined the child's injuries resulted from inflicted trauma.

Under anesthesia, Dr. Onyebuchi Ukabiala, a pediatric surgeon, was able to examine the child's injuries further. Dr. Ukabiala testified the bridge of tissue between the anal and vaginal openings was "completely disrupted. It was torn. It was blown apart. With that type of injury, you have to worry about possibly

extension into the pelvic organs." Dr. Ukabiala had to remove a significant amount of dead tissue to minimize the risk of infection and encourage proper healing. Repair of the nonviable torn tissue was not possible. The only treatment option was to leave the area clean but raw and uncovered—Dr. Ukabiala stated:

> [Y]ou just leave it and allow the body and nature to slowly fill in the tissues with scar tissue, and as that is happening, the edges of the skin and mucus membrane will migrate to a covered raw area as it is healing, and in the end you are hoping that this happens soon enough before too much scar tissue has been laid down.

The child remained hospitalized for several days. Care of the child following discharge involved sitz baths in lukewarm water for fifteen to twenty minutes three times a day with only gentle patting to dry. One week after discharge, Dr. Ukabiala observed the tissue was beginning to fill in but was still raw. After three months, he determined that major reconstructive surgery was not necessary. However, Dr. Ukabiala testified,

> The bridge of tissue between the anal opening, behind, and the vaginal opening in front is known as the perineal body. It is a very important structure because it separates the two, and it is put under enormous stress under some conditions, and it has to be able to handle that stress, and my long-term concern in this child is that because it is no longer soft, pliable, virgin tissue, it is now scar-laden, that it may not be able to withstand those stresses.[2]

Both Doctors Ukabiala and McCann opined the baby's injuries were caused by forcible attempted penetration.

---

[2] Dr Ukabiala explained that because this child's tissue is now scar laden, the stresses it was required to undergo created risks of tearing. Sexual intercourse later in life could be painful and vaginal childbirth would be "very risky." Dr. McCann noted that scar tissue shrinks with time. Although some women without any scarring may develop tissue tears during normal childbirth, this female "is at significant risk of developing uncontrolled, maybe even third degree, tears of her perineum if she is having a vaginal delivery."

***A. Serious Injury.*** Stickrod first argues counsel was ineffective in failing to challenge the sufficiency of the evidence that Stickrod caused the child serious injury. According to Iowa Code section 702.18, a "serious injury"' is a bodily injury which "[c]reates a substantial risk of death," "[c]auses serious permanent disfigurement," or "[c]auses protracted loss or impairment of the function of any bodily part or organ." *See* Iowa Code § 702.18(1)(b)(1)-(3).

There is substantial evidence the child sustained injuries to her anal and vaginal areas, which if left untreated carried a substantial risk of death. *See State v. Hanes*, 790 N.W.2d 545, 554-55 (Iowa 2010) (noting it is appropriate to consider the risk of death if injury is left untreated). Moreover, the child's vaginal and anal tissue is now "scar-laden," which Dr. Ukabiala testified impairs the function of the skin. "Trial counsel has no duty to raise an issue that has no merit." *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003).

***B. Foundation.*** Next, Stickrod asserts counsel should have objected to the admission of the jail inventory report (exhibit 11), his boxer shorts (exhibit 12), and the criminalist's testimony about DNA results from the shorts on hearsay, foundation, and/or chain-of-custody grounds. Because this is raised in the context of an ineffective-assistance-of-counsel claim, Stickrod must show both breach of duty and resulting prejudice. To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also King v. State*, 797 N.W.2d 565, 571 (Iowa 2011).

There is a presumption that "State agents would not tamper with the evidence." *State v. Piper*, 663 N.W.2d 894, 907 (Iowa 2003) (citation omitted), *overruled on other grounds by Hanes*, 790 N.W.2d at 550. The foundational requirement for chain of custody "is generally met by showing the continuous custody of the exhibit was such as to render it improbable that anyone tampered with the original item or substituted a different item." *Id.*

Sheriff Daniel Johnson testified that when Stickrod entered jail his personal items were collected and logged in a jail record (though Johnson did not personally collect them). Exhibit 11 reflects the items collected from Stickrod's person at the time of booking into jail on February 5, 2016. Stickrod's signature is on the inventory report of his property, and there is no evidence suggesting any tampering, alteration, or substitution occurred as to his boxer shorts. On February 8, Deputy Todd Stewart obtained a search warrant for Stickrod's clothing, which he retrieved from a locked jail locker and personally transported to the Division of Criminal Investigations crime lab. Deputy Stewart identified a pair of red boxer shorts (underwear) as shorts taken from Stickrod's jail locker. He put the boxer shorts on a hanger inside out with plastic over it. Criminalist Tara Scott thereafter testified that in examining and testing of the inside fly area of the boxers she identified a body fluid stain consistent with Stickrod's infant daughter's DNA. "The likelihood of a different result need not be more probable than not, but it must be substantial, not just conceivable." *King*, 797 N.W.2d at 572.

Stickrod and the mother were the only caretakers on the day of the injury. Stickrod was solely responsible for the child's care when the bloody diaper was

first observed. Stickrod was sitting on the sofa with the child when the mother left to run some errands. When the mother returned she heard the child crying and Stickrod was either passed out or asleep in bed. Medical testimony reflected the injuries were from inflicted trauma. There is not a substantial likelihood of a different result absent the DNA evidence.

***C. Child Endangerment Jury Instruction.*** Lastly, Stickrod argues counsel was ineffective in failing to challenge the jury instructions setting out the elements of child endangerment.

The jury here was instructed that to find Stickrod guilty of child endangerment resulting in serious injury, the State was required to prove:

> (1) On or about February 4, 2016, the defendant was a parent of A.S.
> (2) A.S. was under the age of 14 years.
> (3) The defendant *knowingly acted in a manner which created a substantial risk* to the physical, mental or emotional health or safety of A.S.
> (4) The defendant's acts resulted in a serious injury to A.S.

(Emphasis added.) The jury was also instructed: "For the defendant to know something means he had a conscious awareness that he was acting in a manner which created a substantial risk to A.S.'s physical, mental or emotional health or safety."

We acknowledge our supreme court has held the instructions used here "did not require the jury to find the defendant had a conscious awareness that [his] actions created a substantial risk to the child's physical, mental, or emotional health or safety."[3] *State v. James*, 693 N.W.2d 353, 355-57 (Iowa 2005)

---

[3] The uniform instruction for this offense has been modified to require the State to prove "[t]he defendant acted with knowledge that [he] [she] was creating a substantial risk to"

(explaining the trial court erred in instructing that "knowingly" refers only to the defendant's act and stating "[t]he instructions should have informed the jury that it must find the defendant acted with knowledge that she was creating a substantial risk to the child's safety"). "It is the appreciation of the probable risks to others posed by one's conduct that creates culpability for criminal endangerment." *Id.* at 355 (citation omitted).

Stickrod claims, "Had the jury been properly instructed, there is a reasonable probability jurors could have concluded Stickrod was in no condition to know the degree of risk he posed to his daughter." We disagree the jury could find an adult would *not* know that by attempting sexual intercourse with a two-month-old infant he was creating a substantial risk to the infant's safety. Even if trial counsel should have objected to the jury instruction, our confidence in the outcome of the trial is not undermined, and Stickrod's ineffectiveness claim fails. *See State v. Harris*, 891 N.W.2d 182, 189 (Iowa 2017) (noting the defendant "must address the instructional error from a different vantage point, however, because his trial counsel did not object to [the] instruction" and "we must apply the familiar prejudice framework prescribed for ineffective-assistance-of-counsel claims").

Upon our de novo review, we conclude Stickrod's ineffectiveness claims fail. The record reflects substantial evidence the infant suffered a serious injury and counsel, thus, had no duty to challenge the sufficiency of the evidence by a motion for judgment of acquittal. Stickrod cannot prove prejudice resulted from a

---

the child's physical, mental, or emotional health or safety." *See* Iowa Crim. Jury Instr. No. 2610.1 (element 3).

failure to object on foundation grounds to the admissibility of DNA evidence or to the jury instructions on the elements of child endangerment.  We affirm.

**AFFIRMED.**