IN THE SUPREME COURT OF IOWA

 No. 158 / 03-0624

 Filed February 10, 2006

STATE OF IOWA,

 Appellee,

vs.

JERRY LEE MICHAEL NEWELL,

 Appellant.

 Appeal from the Iowa District Court for Black Hawk County, Todd A.
Geer, Judge.

 Defendant appeals his conviction for first-degree murder. AFFIRMED.

 Linda Del Gallo, State Appellate Defender, and Tricia A. Johnston,
Assistant State Appellate Defender, for appellant, and Jerry Newell, pro
se.

 Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant
Attorney General, Thomas J. Ferguson, County Attorney, and James Katcher
and Linda Myers, Assistant County Attorneys, for appellee.

TERNUS, Justice.
 The appellant, Jerry Newell, was convicted of first-degree murder in
the death of his live-in girlfriend, Kathy Gillen. See Iowa Code § 707.2
(2001) (defining murder in the first degree). His counsel on appeal
specifies several errors in the district court’s rulings and asserts a
claim of ineffective assistance of counsel. The defendant has filed a pro
se brief raising additional claims. Finding no basis for reversal, we
affirm.
 I. Background Facts and Proceedings.
 The following unchallenged evidence was admitted at the defendant’s
trial. At the time of the victim’s death, the defendant and the victim
were living together with their two-month-old baby in Waterloo, Iowa. On
June 15, 2001, the couple left the baby with the defendant’s mother, Mary
Culbert, went to some garage sales, and then drank at a local bar. While
at the bar, they each had about five drinks. Witnesses who saw them there
said the couple appeared to be getting along well. Around 6:30 p.m.,
Newell and Gillen returned to Culbert’s house and picked up their child.
 After arriving home, Gillen left on foot at approximately 7:45 p.m. to
get something for them to eat from a nearby grocery store. When she did
not return right away, Newell called Gillen’s father to ask if she was
there. Eventually, Newell fixed himself something to eat, fed the baby,
and dozed off on the couch.
 Newell later told the police that he woke up sometime after 10:00 p.m.
when he heard Gillen toss a bag of groceries on the living room floor.
Shortly after that, he claimed he heard a noise in the kitchen. When he
went to investigate he found Gillen lying on the floor, unresponsive.
Newell claimed he tried to revive her by pushing her, throwing water on
her, lifting her head, and attempting CPR. When Gillen did not respond,
Newell said he “freaked.” Instead of calling 911, he called his mother’s
house, looking for his mom. After speaking with his brother, Newell
gathered up the baby and drove to his mother’s house.
 Evidence admitted at trial showed that Newell omitted some facts in
his statements to the police and that not all of his assertions about the
events up to this point in time were true. A cash register receipt from a
nearby grocery store established that Gillen had purchased groceries at
9:29 p.m. that evening. Neighbors testified they saw Gillen outside as it
was getting dark, trying to catch Newell’s dog. One of these neighbors
testified that he saw Newell standing at the back door while Gillen chased
the dog and returned to the house. About an hour later this neighbor heard
the defendant talking to his brother, and then heard the defendant’s car
leave. Another neighbor testified that at about this same time he heard “a
lot of yelling and screaming, doors slamming.” Afterwards, he heard a
truck pull out and speed south down the street. A third witness testified
he actually saw the defendant get into his car and speed off.
 The defendant’s brother, Jonathan Newell, testified that around 9:40
p.m. he answered the phone at the home of Mary Culbert, the Newell
brothers’ mother. The caller was the defendant; he wanted to talk to
Culbert, but Culbert was not home. In a second call to the house, Newell
told his brother that something was wrong with Gillen and said, “She might
be dead.” Jonathan contacted Culbert at a friend’s house, gave her
Newell’s message, and then got on his bike and headed toward Newell’s
house. On the way, he met Newell, and they both returned to Culbert’s
house, where they met Culbert. There, Newell told his mother that Gillen
was on the floor, and he could not tell whether she was breathing. Culbert
then left for Newell’s house.
 After Culbert left, Newell went into his mother’s house with the baby.
Shortly thereafter, he called his own house and talked to Culbert, asking
about Gillen’s condition. He also spoke with Jonathan about what happened
at Newell’s house. According to Jonathan, Newell told him that Gillen was
leaving out the back door when Newell told her, “You ain’t leaving again,”
and pushed her back. Newell told his brother that Gillen made a funny
noise and dropped to the floor. Jonathan testified Newell told Jonathan
that he attempted CPR, poured water on Gillen, and also poured something
into her mouth. Newell was scared and told his brother that he “thought he
was going to get it for murder.” After talking with his brother, Newell
left his mother’s house without his child, but did not tell Jonathan where
he was going.
 In the meantime, Culbert had entered her son’s house and had
discovered Gillen on the floor, warm to the touch but with no pulse. After
speaking with her son on the phone, Culbert called 911 from Newell’s home
at 10:18 p.m. Paramedics were dispatched on a “fall, unconscious person”
call. They arrived at the house within two to three minutes and found the
victim on the kitchen floor, without pulse or respirations. The paramedics
attempted to resuscitate Gillen by initiating CPR and intubating her.
Intubation was difficult because Gillen’s throat kept filling up with a
clear liquid fluid, which contained no evidence of stomach contents.
During an attempt at intubation, the fluid came up through the ET tube and
into one paramedic’s mouth. He testified the fluid tasted like straight
tequila, and he thought that it had been poured into the victim’s mouth.
Despite their efforts, emergency personnel were unable to revive Gillen.
It was estimated that she had been dead from fifteen minutes to an hour
when the paramedics arrived.
 Meanwhile Newell had left Culbert’s house, riding a bicycle over to a
friend’s home, Deanne Waniorek, arriving between 10:00 p.m. and 11:00 p.m.
Newell told Waniorek that he had been upset with Gillen because she had
been gone so long. When Gillen told Newell she was leaving, he responded,
“No, you’re not,” and stopped her by pushing her. Gillen, he stated, fell
over. Newell told Waniorek that initially he thought that Gillen was
faking, and he tried shaking her. When she did not respond, he attempted
CPR, and he was afraid he might have hurt her by doing it incorrectly.
Newell also confided in his friend that he was concerned he “might have
done something wrong and he could be in trouble, he might go to prison.”
While at Waniorek’s home, Newell also talked to another person there, Keith
Wirtz. Newell told Wirtz a different story than he had told Waniorek.
According to Wirtz, Newell told Wirtz that Newell had had an argument with
his girlfriend and that Newell thought she had died of alcohol poisoning.
 Newell stayed at Waniorek’s house a short time and then returned to
his mother’s home. There, he was told that Gillen was dead. When asked
what had happened, Newell said that Gillen had been fine when he left.
Newell paced nervously in the house and repeatedly stated, “What am I going
to do?” After a short time, Newell left his mother’s house. He did not go
home or contact the police. The following day he called his father, and at
about 2:45 p.m., his father took him to the police station.
 Newell was interviewed at the police station on June 16, 2001. As
previously noted, he told the police he heard a noise in the kitchen and
found Gillen passed out on the floor. He claimed he did not know why he
had not called 911, just that the baby was screaming. He also failed to
tell the police about his visit to Waniorek’s house and his conversations
with her and Wirtz.
 A couple of days after Gillen’s death, Newell discussed what had
occurred with his friend, Jim McClain. According to McClain, Newell told
him that when Gillen came home, she threw some beer on the floor, and a few
seconds later, she fell over something. When Newell heard her fall, “he
[came] running out, and one thing led to another, and he started giving her
CPR, and she started vomiting.” McClain testified that Newell said he did
not know if he left any marks on Gillen but that he began to panic and
started “hitting her back and forth trying to bring her to.” Newell also
surmised that in his attempt to perform CPR “he might have came up and hit
[Gillen] in the neck . . . and made marks on her neck.”
 An autopsy of the victim’s body revealed injuries to the internal
structures of Gillen’s neck and pinpoint hemorrhages on her neck, face, and
eyelids, indications that she had been strangled. Gillen also had two
large bruises on her head that had caused subarachnoid hemorrhaging. Over
two dozen bruises were found on her hands, arms, torso, legs and inside her
mouth that had been inflicted about the time of her death. The injuries to
her hands were interpreted to be defensive in nature. A toxicology
evaluation revealed her body contained a low level of alcohol and no other
drugs. The medical examiner ruled the cause of death was strangulation and
blunt force trauma to the back of the victim’s head. The injuries were
consistent with someone strangling the victim and banging her head against
the wall or floor. The injuries were inconsistent with a simple accidental
fall to the floor.
 Newell was subsequently arrested for Gillen’s death. While awaiting
trial, Newell confided in a fellow jail inmate, Eric Pasket, telling him
what happened the night Gillen died. According to Pasket, Newell told him
that after Gillen returned home from the store, the couple argued about
where she had been and how long she had been gone. When Gillen started to
leave the room, Newell ran up behind her and grabbed her, and then their
heads hit. Newell stated he “head butted her twice and then she fell to
the ground.”
 Newell’s friend, Jim McClain, testified at trial that after Newell
learned that Gillen had died from a devastating blow to the head, he
approached McClain, who was also incarcerated at the time, with a
fabricated story to explain Gillen’s head and hand injuries. Newell wanted
McClain to testify that McClain was at the defendant’s residence when
Gillen returned from the store, and that Gillen got angry and stormed into
the kitchen with Newell right behind her. McClain was further to testify
that he followed the couple into the kitchen where he found them
“passionately dancing” with Gillen’s fingers in Newell’s belt loops. Then,
under this scenario, the “accident” occurred when Gillen backed up and
fell, pulling Newell on top of her. According to McClain, Newell thought
the fall would account for Gillen’s head injuries, and Gillen’s fingers
being caught in the belt loops of Newell’s pants would explain the bruises
to her fingers. Newell reportedly told McClain that “this had to become an
accident on [Gillen’s] part or he [Newell] was going to be charged with
first-degree murder.” Newell threatened to give prosecutors information
about McClain if McClain refused to lie for Newell at trial.
 Newell was charged with murder in the first degree under alternative
theories of premeditation and felony murder. See Iowa Code § 707.2(1),
(2). A jury convicted Newell of this charge on March 3, 2003. The
defendant’s motion for new trial and motion in arrest of judgment were
overruled by the trial court, and he was sentenced to life imprisonment.
This appeal followed.
 II. Evidence of Hearsay and Prior Acts.
 A. Challenged testimony. Newell challenges the trial court’s
admission of testimony concerning the relationship between the defendant
and Gillen, claiming the evidence constituted inadmissible hearsay and
inadmissible prior-bad-acts evidence. The defendant objected to the
following testimony:
 1. Gillen’s estranged husband, Robert Gillen, Jr., testified he heard
Newell call Gillen a “dumb f***ing bitch.” He also described a phone
conversation he had with Gillen just days before her death. Gillen seemed
distressed, spoke in whispers, and stated Newell was standing there
listening. Robert Gillen spoke with Gillen again on the day she died.
Gillen was upset and said she did not want their children to visit that
weekend because she had found out something about Newell and was scared.
Gillen told her husband she was planning to leave Newell, but she was
concerned about the baby. She complained that she was not allowed to go
anywhere with the baby alone.
 2. Gillen’s brother, Kevin Hamilton, testified he saw injuries on his
sister, including a knot on her head, about ten days before Gillen’s death.
 His sister told him the defendant had head-butted her. Hamilton testified
Gillen complained that she and Newell were not getting along, and she
expressed fears for her safety. Hamilton thought Gillen was afraid of
Newell.
 3. Gillen’s sister-in-law testified that Gillen told her Newell would
not let Gillen be alone with the baby. Gillen also said that bruises on
Gillen’s head came from being head-butted, and from the context of this
statement, the witness inferred the defendant was the perpetrator. The
witness further testified she observed bruises on the victim’s arm that
looked like fingerprints. Gillen told the witness that she feared the
defendant was going to do something to her. Gillen also expressed concern
that she would not get her baby back if she left Newell.
 4. Another brother of Gillen, Brian Reich, testified Gillen planned
to leave Newell about a month before her death, but changed her mind a week
later. Reich then visited his sister to talk her into leaving, but she was
scared and crying and told him she was afraid Newell would harm her brother
and his fiancée if she left.
 5. Gillen’s cousin testified to her observation that when Gillen and
Newell visited, they usually brought the baby, but when Gillen visited
alone, she never had the baby with her. Gillen always said the baby was
with her mother-in-law. She stated Gillen talked about leaving Newell and
acted scared just talking about doing so. Gillen told the witness one week
before her death that she feared for her safety because she had found out
something about the defendant.
 6. Gillen’s aunt testified that a week before her death, Gillen
expressed fear of the defendant and said he was keeping Gillen on a
timetable. Additionally, the aunt testified Gillen said she had found out
something about the defendant and Gillen was afraid.
 7. Various neighbors testified about verbal arguments they heard, but
they denied seeing any physical abuse.
 8. Jim McClain testified the defendant began treating Gillen badly a
few weeks prior to her death and had begun calling her names, although
McClain never saw any physical altercations. The night before Gillen died
McClain offered to take her away from Newell, but Gillen refused the offer,
expressing fear of the defendant.
 B. Scope of review. We review the defendant’s hearsay claims for
errors at law. State v. Buenaventura, 660 N.W.2d 38, 50 (Iowa 2003).
“Hearsay . . . must be excluded as evidence at trial unless admitted as an
exception or exclusion under the hearsay rule or some other provision.”
State v. Dullard, 668 N.W.2d 585, 589 (Iowa 2003). Subject to the
requirement of relevance, the district court has no discretion to deny the
admission of hearsay if it falls within an exception, or to admit it in the
absence of a provision providing for admission. Id. Inadmissible hearsay
is considered to be prejudicial to the nonoffering party unless otherwise
established. State v. Long, 628 N.W.2d 440, 447 (Iowa 2001).
 Rulings on the admissibility of prior-acts evidence are reviewed for
an abuse of discretion. State v. White, 668 N.W.2d 850, 853 (Iowa 2003).
“[W]e find an abuse of that discretion only when a party claiming it shows
the discretion was exercised on grounds or for reasons clearly untenable or
to an extent clearly unreasonable.” State v. Powell, 684 N.W.2d 235, 238
(Iowa 2004).
 C. Hearsay evidence. Hearsay “is a statement, other than one made by
the declarant while testifying at . . . trial, . . . offered in evidence to
prove the truth of the matter asserted.” Iowa R. Evid. 5.801(c); see also
Dullard, 668 N.W.2d at 589-90 (stating a statement is not hearsay if it is
not offered to prove the truth of the matter asserted). Hearsay is not
admissible unless it falls within one of several enumerated exceptions.
Iowa R. Evid. 5.802; Buenaventura, 660 N.W.2d at 51.
 1. Evidence not hearsay. Much of the evidence to which the
defendant objects is not hearsay. Evidence that Newell was heard to call
the victim derogatory names is not hearsay because it was not offered to
prove the truth of the matter asserted, i.e., that Gillen was what the
defendant called her. See also Iowa R. Evid. 5.801(d)(2) (stating
statement “offered against a party” and which is “the party’s own
statement” is not hearsay). Evidence that the neighbors heard raised
voices and arguing is also not hearsay. These witnesses did not testify to
the content of the arguments, only that they occurred. Similarly,
testimony about injuries the witnesses observed on Gillen prior to her
death was not hearsay because these observations are not statements made by
a declarant other than the witness. The same conclusion is warranted with
respect to the witnesses’ testimony that Gillen appeared scared, nervous,
or distressed. This evidence did not contain any out-of-court statements
admitted for the truth of the matter asserted, only evidence of the
witnesses’ observations.
 2. Evidence falling within an exception to the hearsay rule.
Gillen’s statements to a number of persons that she was scared of Newell,
that she feared for her safety, that she planned to leave Newell, and that
she was afraid if she left Newell, he would keep the baby from her were
admissible under an exception to the hearsay rule for “then existing
mental, emotional, or physical condition.” Iowa R. Evid. 5.803(3). Rule
5.803(3) provides for an exception to the hearsay rule for
 [a] statement of the declarant’s then existing state of mind, emotion,
 sensation, or physical condition (such as intent, plan, motive,
 design, mental feeling, pain, and bodily health), but not including a
 statement of memory or belief to prove the fact remembered or believed
 . . . .
The admission of such evidence under this exception is dependent upon the
relevancy of the declarant’s then existing state of mind, emotion,
sensation, or physical condition. See Buenaventura, 660 N.W.2d at 51.
Gillen’s emotional state was relevant in this case to rebut the defendant’s
position that he and the victim had a loving relationship, as we discuss in
more detail below.
 Gillen’s statement to her estranged husband that Newell was listening
to their conversation was also admissible under an exception to the hearsay
rule. Iowa Rule of Evidence 5.803(1) provides that “[a] statement
describing or explaining an event or condition made while the declarant was
perceiving the event or condition, or immediately thereafter” is not
excluded by the hearsay rule. Gillen’s statement to her husband falls
within this exception.
 3. Erroneously admitted hearsay—prejudice analysis. Although some
of the hearsay statements admitted by the court are not subject to a
readily identifiable exception, we do not think the admission of this
testimony was prejudicial. See Iowa R. Evid. 5.103(a) (“Error may not be
predicated upon a ruling which admits or excludes evidence unless a
substantial right of the party is affected . . . .”). Rule 5.103(a)
requires a harmless error analysis where a nonconstitutional error is
claimed. State v. Sullivan, 679 N.W.2d 19, 29 (Iowa 2004). To determine
whether the error is harmless we ask: “ ‘Does it sufficiently appear
that the rights of the complaining party have been injuriously affected by
the error or that he has suffered a miscarriage of justice?’ ” Id.
(citation omitted). “[W]e presume prejudice—that is, a substantial right
of the defendant is affected—and reverse unless the record affirmatively
establishes otherwise.” Id. at 30.
 In considering whether the admission of hearsay is reversible error,
we have held that notwithstanding the presumption of prejudice from the
admission of such evidence, the erroneously admitted hearsay will not be
considered prejudicial if substantially the same evidence is properly in
the record. State v. Hildreth, 582 N.W.2d 167, 170 (Iowa 1998). That is
the situation here with respect to Gillen’s statements that Newell would
not let her take the baby out alone and that he had her on a timetable.
Jim McClain testified without objection to his observations of Newell’s
controlling behavior with respect to Gillen:

 One observation of Jerry being controlling was with their infant baby.
 If . . . the baby could not stay directly with him, he would leave
 the baby with his mother. He . . . wouldn’t let Kathy take the baby,
 because he was worried that Kathy wouldn’t come back.

Likewise, the fact that the couple was not getting along could be easily
gleaned from the admissible testimony, making Gillen’s statements to that
effect cumulative and their admission harmless error.
 The most troublesome hearsay statements erroneously admitted are
Gillen’s assertions that a large bruise on her head was caused by being
head-butted by the defendant. This court has held, however, that no
prejudice will be found where the evidence in support of the defendant’s
guilt is overwhelming. See State v. Holland, 485 N.W.2d 652, 656 (Iowa
1992) (holding prejudice was not shown due to “the overwhelming evidence,
albeit much of it circumstantial, connecting [the defendant] with the
charged crimes”); cf. State v. Brodene, 493 N.W.2d 793, 797 (Iowa 1992)
(holding evidentiary error that violated the defendant’s right of
confrontation was harmless beyond a reasonable doubt where “other clear
evidence overwhelmingly established [the defendant’s] guilt”). Considering
the evidence that was properly admitted, we think the record affirmatively
establishes a lack of prejudice in this case.
 The medical evidence showed Gillen’s death was not accidental and that
she died from being strangled and beaten. Newell was the only other adult
at home at the time of Gillen’s death, but he did not call for assistance.
Neighbors heard arguing and screaming just before they saw the defendant
speeding away from the residence in his car. Subsequently, Newell gave
several different versions of what had happened, lamented to family and
friends that he was probably in trouble and might be charged with murder,
and tried to convince his friend, Jim McClain, to lie about what happened
on the night of Gillen’s death. Moreover, one of the explanations given by
the defendant for the victim’s injuries was his statement to his jail mate
that just prior to Gillen’s death Newell “head butted [Gillen] twice and
she fell to the floor.” Given the strength of the properly admitted
evidence, including Newell’s own admissions, we think the defendant was not
injuriously affected by the hearsay testimony that he had head-butted
Gillen on a prior occasion, nor did he suffer a miscarriage of justice from
the admission of this evidence. The State has established a lack of
prejudice.
 D. Prior-acts evidence. Rule 5.404(b) governs the admissibility of a
person’s other crimes, wrongs, or acts. This rule provides:

 Evidence of other crimes, wrongs, or acts is not admissible to prove
 the character of the person in order to show that the person acted in
 conformity therewith. It may, however, be admissible for other
 purposes, such as proof of motive, opportunity, intent, preparation,
 plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(b). In order to be admissible, the evidence must be
probative of “ ‘ “some fact or element in issue other than the defendant’s
criminal disposition.” ’ ” State v. Taylor, 689 N.W.2d 116, 123 (Iowa
2004) (citation omitted). “Moreover, . . . when prior-bad-acts evidence is
offered ‘to establish an ultimate inference of mens rea, the court should
require the prosecutor to “articulate a tenable noncharacter theory of
logical relevance.”’ ” Id. at 123-24 (citation omitted). See generally
Iowa R. Evid. 5.401 (stating evidence is relevant if it has “any tendency
to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be
without the evidence”). “If a court determines prior-bad-acts evidence ‘is
relevant to a legitimate factual issue in dispute, the court must then
decide if its probative value is substantially outweighed by the danger of
unfair prejudice to the defendant.’ ” Taylor, 689 N.W.2d at 124 (citation
omitted). Evidence that is unfairly prejudicial is evidence that has “ ‘an
undue tendency to suggest decisions on an improper basis commonly, though
not necessarily, an emotional one.’ ” State v. Plaster, 424 N.W.2d 226,
231 (Iowa 1988) (citation omitted); accord State v. Rodriquez, 636 N.W.2d
234, 240 (Iowa 2001). Because the weighing of probative value against
probable prejudice is not an exact science, we give a great deal of leeway
to the trial judge who must make this judgment call. Rodriquez, 636 N.W.2d
at 240.
 The testimony outlined above showed the following prior acts by the
defendant: he called the victim derogatory names, he head-butted her, he
inflicted bruises on her arms, he listened to her phone conversation with
her estranged husband, he would not let her go anywhere alone with the
baby, and he kept Gillen on a timetable. We must first determine whether
this evidence is relevant to a legitimate issue in the case other than a
general propensity by the defendant to commit wrongful acts. Taylor, 689
N.W.2d at 124. The defendant argues he did not raise a defense of mistake
or accident, and therefore, evidence that he had intentionally hurt Gillen
in the past was irrelevant.
 An essential element of first-degree murder is malice aforethought.
See State v. Lee, 494 N.W.2d 706, 707 (Iowa 1993); see also Iowa Code §
707.1 (“A person who kills another person with malice aforethought either
express or implied commits murder.”). “Malice aforethought” is defined as
“‘a fixed purpose or design to do some physical harm to another that exists
before the act is committed.’ ” Buenaventura, 660 N.W.2d at 49 (citation
omitted). “Because this element is a state of mind, circumstantial
evidence is generally used to prove malice.” Id. We have held the prior
relationship between the defendant and the victim, including bad feelings,
quarrels, and physical acts, is a circumstance that may be shown to prove
the defendant’s state of mind and motivation at the time of the crime. See
Taylor, 689 N.W.2d at 128 (stating “defendant’s prior acts of violence
toward his wife [were] relevant to his motive and intent on the day [of the
alleged assault]”); Buenaventura, 660 N.W.2d at 49 (same); State v.
Kellogg, 263 N.W.2d 539, 542 (Iowa 1978) (same).
 The court’s instruction to the jury defining this element was
consistent with these legal principles. The jury was instructed:

 “Malice” is a state of mind which leads one to intentionally do
 a wrongful act to the injury of another or in disregard of the rights
 of another out of actual hatred, or with an evil or unlawful purpose.
 It may be established by evidence of actual hatred, or by proof of a
 deliberate or fixed intent to do injury. It may be found from the
 acts and conduct of the Defendant and the means used in doing the
 wrongful and injurious act. Malice requires only such deliberation
 that would make a person appreciate and understand the nature of the
 act and its consequences, as distinguished from an act done in the
 heat of passion.
 “Malice aforethought” is a fixed purpose or design to do some
 physical harm to another which exists before the act is committed. It
 does not have to exist for any particular length of time.
 Although motive is not a necessary element of murder, lack of
 motive may be considered in determining whether the Defendant acted
 with malice aforethought.

 We think the evidence challenged here was highly relevant to the
issue of malice aforethought because it showed the relationship between the
defendant and the victim and was pertinent to the defendant’s possible
motive for beating and strangling Gillen. If Newell and Gillen had an
acrimonious relationship, it is more probable that Newell acted with
malice—a fixed purpose to do harm—at the time of Gillen’s death than if
they had a loving relationship. Similarly, if Newell was possessive and
controlling of Gillen, it is more likely that he acted with a fixed purpose
to do physical harm to her when she returned home after an inordinately
long and unexplained absence. In considering the admission of similar
evidence in a prosecution for domestic abuse assault and burglary, we
stated:

 [T]he defendant’s prior conduct directed to the victim of a crime,
 whether loving or violent, reveals the emotional relationship between
 the defendant and the victim and is highly probative of the
 defendant’s probable motivation and intent in subsequent situations.
 The most obvious example of the legitimate use of prior-bad-acts
 evidence is the admission of evidence of a defendant’s prior assaults
 of a victim in a prosecution of the defendant for the subsequent
 murder of the victim. Courts have admitted such evidence to show the
 defendant’s motive and intent with respect to the actions giving rise
 to the charged crime when intent is disputed.

Taylor, 689 N.W.2d at 125 (citations omitted); accord White, 668 N.W.2d at
855 (finding no abuse of discretion in admission of defendant’s prior
assault on victim in prosecution for first-degree kidnapping and first-
degree burglary); State v. Emerson, 375 N.W.2d 256, 260 (Iowa 1985)
(admitting evidence of prior quarrels between defendant and victim in
prosecution of defendant for first-degree murder); Kellogg, 263 N.W.2d at
542 (same).
 Contrary to the defendant’s claim on appeal, we think the element of
intent—malice aforethought—was contested at trial. Newell told the police
he had a loving relationship with the victim, and several of the
defendant’s versions of what happened that night portrayed Gillen’s death
as accidental. In closing arguments, defense counsel repeatedly suggested
that the relationship between the defendant and Gillen was amicable, and
that the State had failed to establish the defendant’s malice or ill will
toward the victim. Because the defendant’s intent to do harm to Gillen was
in dispute and because the evidence in question was probative of the
defendant’s relationship with Gillen and his possible motive for harming
her, the State articulated a tenable noncharacter theory of logical
relevance to support admission of this evidence.
 We turn to the question of prejudice: is the probative value of this
evidence substantially outweighed by its prejudicial effect? In balancing
probative value against prejudicial effect, the court considers

 the need for the evidence in light of the issues and the other
 evidence available to the prosecution, whether there is clear proof
 the defendant committed the prior bad acts, the strength or weakness
 of the evidence on the relevant issue, and the degree to which the
 fact finder will be prompted to decide the case on an improper basis.

Taylor, 689 N.W.2d at 124.
 Our examination of the record shows a need for the challenged
evidence. Although there was strong circumstantial evidence that Newell
was the person who committed the act that killed Gillen, the prosecution
had the additional burden to prove the defendant acted with malice
aforethought, or ill will, at the time of Gillen’s death. The only other
evidence indicating malice was the manner in which Gillen was killed. We
think evidence of the abusive and controlling nature of the relationship
between Newell and Gillen was strong evidence of Newell’s emotional and
mental state at the time of Gillen’s death, as well as his motive for
murdering the mother of his child. Moreover, we agree with our observation
in Taylor that a defendant should not be allowed to have his guilt or
innocence determined “ ‘on a false presentation that his and the victim’s
relationship [was] peaceful and friendly.’ ” Id. at 130 (citation
omitted). Here, the defense sought to establish that Newell loved Gillen
and bore her no ill will. Therefore, the State needed, and was entitled,
to rebut this argument with evidence to the contrary.
 “In assessing whether there is clear proof of prior misconduct, it is
not required that the prior act be established beyond a reasonable doubt,
nor is corroboration necessary.” Id. “There simply needs to be sufficient
proof to ‘ “prevent the jury from engaging in speculation or drawing
inferences based on mere suspicion.” ’ ” Id. (citation omitted). Here,
there was clear proof of name-calling in that several witnesses to these
acts confirmed such occurrences. Similarly, various witnesses observed
signs of physical abuse and given the context of these observations and the
victim’s well-documented fear of the defendant, we do not think the jury
would have to speculate that Gillen’s injuries were caused by Newell.
Finally, evidence of Newell’s controlling behavior with respect to Gillen
also came from several sources. We think there was clear proof the
defendant committed the prior acts attributed to him.
 Balanced against the need for the evidence, its reliability, and its
probative strength is the danger of unfair prejudice. In evaluating the
prejudice factor, we consider the likelihood that the prior-acts evidence
will prompt the jury to base its decision on an improper emotional response
toward the defendant. Id. Certainly the evidence of Newell’s name-calling
and violence reflected adversely on him and probably made him an
unsympathetic character in the jury’s eyes. Nonetheless, this evidence was
essential to the truth-seeking function of the jury. See id. (stating “
‘[a] trial is a search for the truth,’ ” and thus, defendant’s other acts
are admissible to show his true relationship with the victim (citation
omitted)). Therefore, the trial court was well within the bounds of
permissible discretion in determining any danger of unfair prejudice did
not substantially outweigh the high probative value of the challenged
evidence. See White, 668 N.W.2d at 855 (finding trial court acted
reasonably in admitting evidence of defendant’s prior assault of victim
notwithstanding that “the jury could have been swayed by unfair prejudice
from the admission of the evidence”).
 III. Testimony Concerning Statements Made by Mary Culbert.
 A. The defendant’s claim. The defendant objected to the admission of
the recording of Culbert’s 911 call and the testimony of four witnesses,
all of which revealed statements made by Culbert on the night Gillen died.
Newell claims the admission of his mother’s out-of-court statements
violated the Confrontation Clause because Culbert had died by the time of
trial; thus, her statements were not subject to cross-examination by the
defense. We review claims based on the Confrontation Clause de novo. State
v. Hallum, 606 N.W.2d 351, 354 (Iowa 2000). The defendant also challenges
these statements as irrelevant and inadmissible hearsay. We review the
latter claims for correction of errors of law. See Buenaventura, 660
N.W.2d at 50.
 Much of the testimony to which the defendant objected was admitted by
the trial court under an exception to the hearsay rule for excited
utterances. See Iowa R. Evid. 5.803(2) (excluding from the hearsay rule
“[a] statement relating to a startling event or condition made while the
declarant was under the stress of excitement caused by the event or
condition”). Although we base our decision on a different rationale, we
find no reversible error in the trial court’s ruling. See DeVoss v. State,
648 N.W.2d 56, 62-63 (Iowa 2002) (stating appellate court can affirm
evidentiary ruling on any ground raised on appeal). As we discuss below,
we conclude (1) the challenged testimony was admissible because it was not
hearsay or, (2) to the extent it did constitute hearsay, its admission was
not prejudicial. Under both conclusions, the court’s allowance of
Culbert’s out-of-court statements did not violate the Confrontation Clause.
 B. General legal principles. The Sixth Amendment to the United
States Constitution guarantees that “[i]n all criminal prosecutions, the
accused shall enjoy the right . . . to be confronted with the witnesses
against him.” U.S. Const. amend. VI; see also Pointer v. Texas, 380 U.S.
400, 406, 85 S. Ct. 1065, 1069, 13 L. Ed. 2d 923, 927-28 (1965) (stating
this procedural guarantee is applicable to state prosecutions). Two
important policies underlie the Confrontation Clause: “a preference for
face-to-face confrontation at trial and the right of cross-examination.”
State v. Castaneda, 621 N.W.2d 435, 444 (Iowa 2001). Although this
constitutional provision generally protects the same values as the hearsay
rule, “the Confrontation Clause bars the admission of some evidence that
would otherwise be admissible under an exception to the hearsay rule.” Id.
 On the other hand, the Confrontation Clause, like the hearsay rule, does
not prevent “the use of testimonial statements for purposes other than
establishing the truth of the matter asserted.” Crawford v. Washington,
541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 1369 n.9, 158 L. Ed. 2d 177, 198 n.9
(2004).
 The United States Supreme Court recently discussed the parameters of
the Confrontation Clause in Crawford. While not confining this provision
to testimonial statements of out-of-court declarants, the Court concluded
“testimonial hearsay” was the “primary object” of the Sixth Amendment. Id.
at 53, 60, 124 S. Ct. at 1365, 1370, 158 L. Ed. 2d at 194, 199. Included
in the category of testimonial statements is “prior testimony at a
preliminary hearing, before a grand jury, or at a former trial . . . and to
police interrogations.” Id. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at
203. The Court suggested that a casual or off-hand remark to an
acquaintance may be excludable under the hearsay rule, but “bears little
resemblance to the civil-law abuses the Confrontation Clause targeted.”
Id. at 51, 124 S. Ct. at 1364, 158 L. Ed. 2d at 192.
 More importantly, the Court differentiated the test for admissibility
depending upon whether the out-of-court statement is testimonial.
Testimonial statements may be admitted only if the declarant is unavailable
and only if the defendant has had a prior opportunity for cross-
examination. Id. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203. As for
nontestimonial hearsay, the Court observed that it would be consistent with
“the Framers’ design to afford the States flexibility in their development
of hearsay law” to “exempt[ ] such statements from Confrontation Clause
scrutiny altogether” or to apply the principles set forth in Ohio v.
Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). Id. The
Court summarized Roberts as holding the Confrontation Clause “does not bar
admission of an unavailable witness’s statement against a criminal
defendant if the statement bears ‘adequate “indicia of reliability,” ’ ” a
test met when the evidence “either falls within a ‘firmly rooted hearsay
exception’ or bears ‘particularized guarantees of trustworthiness.’ ” Id.
at 40, 124 S. Ct. at 1358, 158 L. Ed. 2d at 186 (quoting Roberts, 448 U.S.
at 66, 100 S. Ct. at 2531, 65 L. Ed. 2d at 608). The Court was clear,
however, that the Roberts test was not applicable to testimonial hearsay.
Id. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203.
 Like the erroneous admission of hearsay, the admission of evidence in
violation of the Confrontation Clause does not mandate reversal: if the
State establishes that the error was harmless beyond a reasonable doubt,
reversal is not required. See State v. Brown, 656 N.W.2d 355, 361 (Iowa
2003). To determine harmlessness, the inquiry “is not whether, in a trial
that occurred without the error, a guilty verdict surely would have been
rendered, but whether the guilty verdict actually rendered in this trial
was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S.
275, 279, 113 S. Ct. 2078, 2081, 124 L. Ed. 2d 182, 189 (1993). Several
factors are relevant in assessing whether error was harmless:

 “[T]he importance of the witness’ testimony in the prosecution’s case,
 whether the testimony was cumulative, the presence or absence of
 evidence corroborating or contradicting the testimony of the witness
 on material points, the extent of cross examination otherwise
 permitted, and, of course, the overall strength of the prosecution's
 case.”

Brown, 656 N.W.2d at 361-62 (citation omitted).
 C. Nontestimonial statements. We will first discuss the
nontestimonial statements made by Culbert that were introduced at trial.
To determine whether this evidence violated the Confrontation Clause, we
must decide (1) whether Culbert’s statements were offered to prove the
truth of the matter asserted, and if so, (2) whether these statements fall
within a “firmly rooted hearsay exception” or bear other “particularized
guarantees of trustworthiness.” Roberts, 448 U.S. at 66, 100 S. Ct. at
2539, 65 L. Ed. 2d at 608. If we conclude the admission of any of
Culbert’s nontestimonial statements violated the Sixth Amendment, we must
then consider the question of prejudice.
 1. The 911 call. In the 911 tape recording, Culbert asked for an
ambulance, and stated her daughter-in-law had fallen and was unresponsive.
Culbert also indicated she was present when Gillen fell, stating her
daughter-in-law had been drinking quite heavily.
 The statements made by Culbert in this tape recording were not
offered to proof the truth of the matter asserted. Rather, the prosecution
sought to prove that Culbert attempted to cover-up for her son almost
immediately. Therefore, the probative value of these statements rested on
the fact they were made, not on whether her story about what happened was
true. Because Culbert’s statements in the 911 call were not hearsay, their
admission did not violate the Confrontation Clause.
 2. Scroggins’ testimony. Newell’s sister and Culbert’s daughter,
Christine Scroggins, testified that Culbert called her from Newell’s house
and told her Gillen was dead. She said Culbert was “frantic,” “freaking
out,” “in an uproar,” and “upset.” Culbert told Scroggins to come to
Newell’s house. According to Scroggins, Culbert “kept saying something
about a dinner plate.” The defendant claims he was prejudiced by the
erroneous admission of Culbert’s statement that Gillen was dead and
Culbert’s reference to “something about a dinner plate.”
 We do not consider whether either of these statements is inadmissible
hearsay because, even if they are, their admission cannot be deemed
prejudicial to Newell. Evidence that the victim was dead when Culbert
called 911 was already in the record from numerous sources. Therefore,
Scroggins’ testimony to the same fact was not prejudicial. See State v.
Whitfield, 315 N.W.2d 753, 755 (Iowa 1982) (holding that when same evidence
is already in the record, admission of hearsay is not prejudicial). The
second objectionable statement was elicited as follows:

 Q. . . . when—you were trying to calm [Culbert] down, she’s
 hysterical, did she say anything to you about what happened?
 A. She kept saying something about a dinner plate.

At this point, the defendant’s objection to any further testimony on this
matter was sustained. Newell claims on appeal Scroggins’ testimony implied
there had been a fight between himself and Gillen that involved the
throwing of dinner plates. We think the solitary reference to a dinner
plate was so vague and nonspecific that it cannot be considered
prejudicial.
 3. Jones’s testimony. Culbert’s friend, Donna Jones, testified that
Culbert was at Jones’s house the night Gillen died. She testified that
Jonathan Newell called Jones’s house looking for Culbert. After Culbert
spoke with her son, Culbert tossed the phone down, stated she had to leave,
and said something to the effect “Kathy” and “dead.” Jones also testified
that a few days later she and Culbert disagreed about what Culbert had told
Jones at the time of the phone call from Jonathan.
 Culbert’s statement when she left Jones’s house is too vague to be
prejudicial. It is not clear whether Culbert thought Gillen was already
dead or whether she had been told Gillen might be dead. In either event,
these statements were cumulative of other admissible evidence that Gillen
was or might have been dead when Newell attempted to reach his mother.
Therefore, Newell was not prejudiced by Jones’s testimony that Culbert said
“Kathy” and “dead.” Jones’s testimony that she and Culbert disagreed about
what Culbert told Jones on the night of Gillen’s death is clearly not
hearsay. Any implied statement made by Culbert in her later conversation
with Jones was offered to demonstrate Culbert’s efforts to cover-up for her
son, not to prove the truth of what she said.
 4. Hamlin’s testimony. Culbert’s sister, Evelyn Hamlin, also
testified. She said that on the night Gillen died, she was called to come
to Newell’s house to help Culbert. According to Hamlin, Culbert was very
distressed, was crying, and kept saying “it’s not true.” Hamlin testified
that Culbert told her that Newell had told Culbert that he had been
watching the baby, that Gillen went out to get food, that when Gillen came
back Gillen was mad at the defendant and threw some sandwiches on the
table, saying “there’s your food,” and headed for the back door. As with
the testimony of Jones, the prior statements made by Culbert were offered
to show that they were made, not to prove the truth of the matter asserted.
 Because they are not hearsay, their admission does not violate the
Confrontation Clause.
 D. Testimonial statements. We now consider the testimony of two
police officers who talked with Culbert on the night of Gillen’s death.
 1. Officer Chapman’s testimony. Officer Joseph Chapman testified
that when he was at the scene of the crime, Culbert told him that Newell
had asked her to check on Gillen because Gillen was not feeling well.
Culbert told the officer that she had been with Gillen for about one-half
hour prior to the incident. She further stated that although Culbert was
at the house when Gillen fell, Newell was not. The officer testified that
at the time these statements were made, Culbert was very excited and at
times “temporarily out of control” emotionally. The court instructed the
jury that Culbert’s statements to officer Chapman were not to be considered
for the truth of the matter asserted.
 Notwithstanding the testimonial nature of Culbert’s statements to the
officer, their admission does not violate the Confrontation Clause because
the statements are not hearsay. Culbert’s explanation of what happened on
the evening of Gillen’s death was not offered to prove that what Culbert
stated actually occurred, but rather to show that Culbert was aware that
something had happened between her son and the victim and Culbert was
trying to protect him by offering an exonerating picture of the event.
 2. Detective Moller. The final witness testifying to statements
made by Culbert was Detective Lynn Moller. The detective testified to
essentially the same statements and observations as did officer Chapman.
In addition, detective Moller spoke with Culbert a second time, after he
had returned from looking for Newell. During the second conversation,
Culbert changed her story. She admitted she had not spent time with Gillen
that evening, and that Gillen was already on the floor when Culbert
arrived. Culbert asserted she lied because she was afraid Newell would be
in trouble for not calling 911.
 The detective’s recitation of Culbert’s first version of events was
not hearsay because Culbert’s statement that she was with Gillen prior to
and at the time of Gillen’s collapse was not offered to prove the truth of
these assertions. In contrast, Culbert’s subsequent version of what had
occurred was offered to prove the truth of the matter asserted, namely,
that Gillen was already injured, if not dead, when Culbert arrived and
Culbert was worried her son would be in trouble for leaving the scene.
This information was, however, merely cumulative of Newell’s own statements
to the police that Gillen collapsed while he was home and that he tried to
revive her, panicked, and left. See Brown, 656 N.W.2d at 361 (finding no
prejudice from admission of evidence in violation of hearsay rule and
Confrontation Clause where same evidence was in the record through the
defendant’s own admissions to jail mates). Moreover, these facts were
essentially undisputed at trial. See In re Detention of Palmer, 691 N.W.2d
413, 422 (Iowa 2005) (“No prejudice results from erroneous admission of
evidence on an issue that is undisputed.”). The dispute at trial centered
not on the fact of Newell’s involvement in Gillen’s death, which was the
critical fact contained in Culbert’s later statement to the detective; the
dispute in the case centered on the nature of Newell’s involvement. Under
these circumstances, we think the jury’s guilty verdict was surely
unattributable to this evidence, and therefore, its admission was harmless
beyond a reasonable doubt.
 IV. Testimony of Expert on Domestic Violence.
 A. Challenged testimony. Over the defendant’s objection, the court
allowed the testimony of Lieutenant David Taylor, who had previously been
an investigator for the domestic abuse response team for three years.
Taylor explained the issues of power and control involved in domestic
violence. He stated the use of intimidation, emotional abuse, isolation of
the victim, blaming the victim, using children as pawns, economic abuse,
coercion, and threats are aspects of abusive domestic relationships,
although not all attributes are present in every situation. Taylor also
described the continuum of violence and the potential that domestic
violence will escalate. Finally, he testified about the reasons women stay
in abusive and violent relationships. The witness was not asked, nor did he
testify, about the relationship between Newell and Gillen or any aspect of
the case at hand.
 The defendant challenged Taylor’s qualifications to give the described
testimony. He also claimed that the authority upon which this witness
relied included materials prepared for law enforcement training that were
not subject to peer review. In addition, Newell argued the evidence was
irrelevant and to the extent it was relevant, its prejudicial effect as
thinly disguised propensity evidence outweighed its probative value.
 B. Applicable legal principles. We review the admission of expert
testimony for an abuse of discretion. Rodriquez, 636 N.W.2d at 245. The
court’s ruling is considered in light of “ ‘[t]he general rule in this
jurisdiction . . . of liberality in the admission of opinion evidence.’ ”
Id. (citation omitted). We are also guided by our rules of evidence:

 If scientific, technical, or other specialized knowledge will assist
 the trier of fact to understand the evidence or to determine a fact in
 issue, a witness qualified as an expert by knowledge, skill,
 experience, training, or education may testify thereto in the form of
 an opinion or otherwise.

Iowa R. Evid. 5.702.
 C. Discussion. Contrary to the defendant’s assertion, Taylor was
sufficiently qualified in the area of his testimony. He had extensive
training in domestic abuse, met with approximately 500 victims of domestic
violence a year in his capacity as an investigator, trained others in the
area of domestic abuse, and received two awards for his work with domestic
violence victims. See State v. Belken, 633 N.W.2d 786, 800 (Iowa 2001)
(stating witness’s education, training and experience qualified him as an
expert; witness’s technical ability went to weight of his testimony, not
its admissibility). The defendant’s criticism of the authorities upon
which Taylor relied is also an insufficient basis upon which to disqualify
Taylor as an expert. These authorities were not shown to be unreliable,
and the jury could consider the lack of peer review in determining the
weight to give to Taylor’s testimony. See State v. Kolbet, 638 N.W.2d 653,
660 (Iowa 2001) (stating reliability of expert’s opinions is for the jury
to determine).
 We also think Taylor’s testimony was relevant. Newell claimed
Gillen’s injuries were accidental. In addition, his attorney, in closing
argument, tried to portray Gillen and Newell’s relationship as loving and
caring, and vehemently disputed any evidence of malice. As we discussed
earlier in connection with the prior-acts evidence, an understanding of the
relationship between Gillen and Newell was essential to the jury’s ability
to determine Newell’s state of mind on the night of Gillen’s death and what
might have motivated him to beat and strangle her. Cf. Rodriquez, 636
N.W.2d at 246 (upholding admission of expert on battered women’s syndrome
in prosecution of defendant for the assault and kidnapping of his
girlfriend); State v. Gettier, 438 N.W.2d 1, 5-6 (Iowa 1989) (finding no
abuse of discretion in admission of expert testimony concerning post-
traumatic stress disorder in sexual-abuse prosecution).
 We also conclude the probative value of this evidence is not
substantially outweighed by its prejudicial effect. See Iowa R. Evid.
5.403 (allowing court to exclude relevant evidence “if its probative value
is substantially outweighed by the danger of unfair prejudice”). The
expert’s explanation of the dynamics of domestic violence was not unfairly
prejudicial to the defendant as required by rule 5.403. The expert’s
testimony would have an adverse effect on Newell’s defense only to the
extent it had probative value. The expert never testified that Gillen was
a victim of domestic violence. That determination was left to the jury.
Consequently, only if the jury decided the relationship between Newell and
Gillen could be explained or aptly interpreted by the principles described
by the expert would the expert’s testimony be prejudicial to the defendant.
 But this type of prejudice is inherent in any evidence that is probative
of a material issue. Therefore, we do not think this evidence was unfairly
prejudicial so as to outweigh its value as probative evidence.
 V. Instructions on Malice Aforethought.
 The defendant claims the trial court erred in instructing the jury
that malice could be inferred from the commission of one of the underlying
felonies that served as the basis for submission of the felony murder
alternative of the first-degree murder charge: willful injury,
participation in assault causing serious injury, and domestic abuse
assault. He argues this instruction essentially told the jury that it was
not required to find malice aforethought if its verdict rested on one of
the felony alternatives. Newell also contends the inference of malice from
the commission of these particular felonies is improper because malice is
not an element in any of these crimes and specific intent is required in
only one of them.
 We review the defendant’s claim of instructional error for the
correction of errors of law. See State v. Piper, 663 N.W.2d 894, 915 (Iowa
2003). In addition, in evaluating the correctness of any particular
instruction, we do not consider it in isolation, but in the context of all
the instructions. See State v. Fintel, 689 N.W.2d 95, 104 (Iowa 2004)
(“Jury instructions are not considered separately; they should be
considered as a whole.”).
 The marshalling instruction for the first-degree murder charge
provided in pertinent part:

 The State must prove all of the following elements of Murder in the
 First Degree:

 1. That on or about June 15, 2001, the defendant hit and/or
 strangled Kathleen Gillen.

 2. Kathleen Gillen died as a result of being hit and/or strangled.

 3. The Defendant acted with malice aforethought.

 4.(a) The Defendant acted willfully, deliberately, premeditatedly, and
 with a specific intent to kill Kathleen Gillen.

 OR

 4.(b) The Defendant was participating in the offense of Willful Injury
 as explained in Instruction No. 29.

 OR

 [The instruction continues with other alternatives for felony murder
 based on participation in assault causing serious injury and
 participation in domestic abuse assault.]

(First emphasis added.) Contrary to the defendant’s assertions, this
instruction clearly told the jury that it was required to find malice
aforethought under any of the alternatives for first-degree murder.
Furthermore, the instruction defining “malice” and “malice aforethought”
included the following statement: “[Malice] may be found from the acts and
conduct of the Defendant and the means used in doing the wrongful and
injurious act.” Consistently with this instruction, the court also told
the jury in another instruction: “You may, but are not required to, infer
malice from the commission of a Willful Injury or Assault Causing Serious
Injury or Assault Domestic Abuse which results in death.”
 We do not think the latter instruction, stating that malice may be
inferred from the specified conduct, is the equivalent of telling the jury
that malice need not be present at all. Here, before the jurors could
convict the defendant of first-degree murder, they were required to find
that the defendant acted with “a fixed purpose or design to do some
physical harm to [Gillen].” The commission of a forcible felony was simply
one factor from which the defendant’s state of mind could be determined.
Contrary to the defendant’s argument, the instructions did not eliminate
the requirement of malice aforethought under the felony murder alternatives
of first-degree murder. The instructions simply informed the jury of the
relevancy of the defendant’s actions to the existence of malice. Moreover,
there is no requirement that the underlying felony include malice or
specific intent as an element in order for the defendant’s criminal conduct
to be relevant to the issue of malice. See State v. Oliver, 341 N.W.2d
744, 748 (Iowa 1983). We hold the trial court properly instructed the
jury.
 VI. Domestic Abuse Assault as Predicate Offense for Felony Murder.
The defendant claims error in the trial court’s refusal to dismiss the
felony murder charge based on third-offense domestic abuse assault. He
argues third-offense domestic abuse assault is a felony only due to the
fact that the offense was committed at least three times; without this
prior-crimes sentencing enhancement, domestic abuse is a misdemeanor. See
Iowa Code § 708.2A(2)(b) (“On a first offense of domestic abuse assault,
the person commits . . . [a] serious misdemeanor, if the domestic abuse
assault causes bodily injury or mental illness.”), .2A(4) (“On a third or
subsequent offense of domestic abuse assault, a person commits a class “D”
felony.”). Newell contends the legislature did not intend that a felony
murder be based on a misdemeanor offense for which repeat offenders are
sentenced as felons. See id. §§ 707.2(2) (stating a person commits murder
in the first degree if “[t]he person kills another person while
participating in a forcible felony”), 702.11(1) (defining a “forcible
felony” to include a felonious assault). We need not address this issue
because Newell suffered no prejudice from the submission of this
alternative. See Rodriquez, 636 N.W.2d at 239 n.1 (refusing to reverse
defendant’s convictions based on alleged error in submission of attempted
murder charge because defendant was not prejudiced: he was acquitted of
attempted murder charge and had not established that the challenged offense
“infected his convictions of the other offenses”).
 To avoid possible prejudice from proof of Newell’s prior convictions
for domestic abuse assault, the trial court decided to submit the “third-
offense” element of third-offense domestic abuse assault to the jury only
if the jury convicted the defendant of first-degree murder and only if the
jury relied solely on the domestic abuse assault alternative to do so. In
its verdict, the jury indicated in response to a special interrogatory that
no member of the jury had “relied solely and exclusively on the theory of
participation in Assault Domestic Abuse” to convict the defendant of first-
degree murder.
 Newell argues that even if the jury verdict establishes that he was
not convicted of first-degree murder based solely on the domestic-abuse-
assault alternative, he was still prejudiced by the submission of this
theory because it opened the door to proof of Newell’s prior bad acts
against the victim. But as our discussion of the defendant’s challenge to
the admission of prior-acts evidence explains, this evidence was relevant
to the malice aforethought element of murder, an element common to all
alternatives of first-degree murder. Consequently, even if domestic abuse
assault had not been included in the first-degree murder instruction, the
prior-acts evidence would still have been admissible. Therefore, the
defendant has failed to show that any error in the submission of the
domestic-abuse-assault theory infected his first-degree murder conviction.

 VII. Ineffective-Assistance-of-Counsel Claim—Improper Bolstering of
Witness’s Testimony.
 A. General principles. We have previously summarized the principles
governing our consideration of ineffective-assistance-of-counsel claims
asserted on direct appeal of the defendant’s conviction. They are:

 Two elements must be established to show the ineffectiveness of
 defense counsel: (1) trial counsel failed to perform an essential
 duty; and (2) this omission resulted in prejudice. A defendant’s
 inability to prove either element is fatal.
 “Generally, ineffective-assistance claims are preserved for
 postconviction relief proceedings to afford the defendant an
 evidentiary hearing and thereby permit the development of a more
 complete record.” If the record on appeal shows, however, that the
 defendant cannot prevail on such a claim as a matter of law, we will
 “affirm the defendant’s conviction without preserving the ineffective-
 assistance-of-counsel claims.” Conversely, if the record on appeal
 establishes both elements of an ineffective-assistance claim and an
 evidentiary hearing would not alter this conclusion, we will reverse
 the defendant’s conviction and remand for a new trial.

State v. Graves, 668 N.W.2d 860, 869 (Iowa 2003) (citations omitted).
 The defendant claims his trial counsel was ineffective in failing to
object to a police officer’s alleged improper bolstering of another
witness’s testimony. We conclude as a matter of law that the defendant
cannot prevail on this claim.
 B. Discussion. Newell argues on appeal that detective Moller
improperly commented on the truth and veracity of a later witness, Jim
McClain. This alleged bolstering occurred during defense counsel’s cross-
examination of Moller. Counsel questioned the detective about overtures
made to McClain to assist in the prosecution of other cases. In response,
Moller stated:

 A. No. But what I recall is . . . McClain stating, “I realize I’m
 probably not going to get” . . . “I’m probably not going to get
 anything out of this, but I knew Kathy. She was a decent gal. She
 didn’t deserve this. . . .”

Further questioning on this topic elicited similar testimony. In addition,
the defense complains about the following testimony of Moller:

 Q. Would you believe anything he [McClain] told you?
 A. If it can be corroborated, yes. I’m not saying—in police work,
 anybody you talk with you try to corroborate what they say, whether it
 be a citizen off the street or somebody in the Black Hawk County jail.

The defendant claims these answers were improper opinion testimony about
the veracity of witness McClain, who testified for the prosecution. See
State v. Brotherton, 384 N.W.2d 375, 378 (Iowa 1986) (holding expert cannot
testify on matters “ ‘that either directly or indirectly render an opinion
on the credibility or truthfulness of a witness’ ” (citation omitted)); cf.
State v. Hulbert, 481 N.W.2d 329, 332 (Iowa 1992) (holding opinion evidence
may not be employed as a direct comment on the guilt or innocence of the
defendant).
 Moller’s testimony about McClain’s remarks was not an improper
comment on McClain’s veracity, because Moller simply reiterated McClain’s
professed reasons for coming forward to testify. Moller did not state
whether he believed these reasons were McClain’s true motivation. Because
there would have been no merit to an objection that the witness improperly
commented on the veracity of another witness, trial counsel was not
ineffective as a matter of law for failing to make this objection. See
Taylor, 689 N.W.2d at 134 (stating counsel has no duty to make an objection
that lacks merit).
 We do not decide whether trial counsel failed to perform an essential
duty when he did not object to Moller’s second comment—that Moller would
believe McClain if McClain’s testimony could be corroborated—because no
prejudice resulted from the admission of this testimony. Moller’s comment
was at most a lukewarm endorsement of McClain’s veracity. Moreover, Moller
testified that in police work, one corroborates everyone’s testimony,
implying that he considered McClain no more or less trustworthy than any
other witness. Given the overwhelming evidence against the defendant,
there is no reasonable probability—as a matter of law—that, but for the
admission of this evidence, the outcome of the trial would have been any
different. See id. (stating defendant must show “ ‘a reasonable
probability that, but for counsel’s unprofessional errors, the result of
the proceeding would have been different’ ” (citation omitted)).
 VIII. Testimony Regarding Defendant’s Incarceration for Drug
Offense.
 The defendant assigns as error the trial court’s refusal to grant a
mistrial after the defendant’s jail mate, Eric Pasket, testified to the
defendant’s incarceration on “drug charges.” When Pasket was asked, “What
did [Newell] say he was in there for?” Pasket responded, “He was in there
for drug charges and murder charge.” The defendant’s attorney did not
immediately object, not wanting to call attention to this testimony. At
the next break and outside the presence of the jury, trial counsel
requested a mistrial. The court denied the defendant’s request, and
pursuant to the defendant’s wishes, did not admonish the jury to disregard
the witness’s statement.
 The defendant claims the court erred in failing to grant a mistrial
due to the prejudicial nature of the testimony. We review the court’s
ruling for an abuse of discretion. See Piper, 663 N.W.2d at 901. “A
mistrial is appropriate when ‘an impartial verdict cannot be reached’ or
the verdict ‘would have to be reversed on appeal due to an obvious
procedural error in the trial.’ ” Id. at 902. The pertinent question here
is whether the trial court was clearly unreasonable in concluding an
impartial verdict could be reached notwithstanding the witness’s testimony
that Newell said he was in jail on drug charges.
 We do not think the court’s exercise of its discretion was clearly
unreasonable. The reference to drug charges occurred only once, and there
were no questions that elaborated on this information. See State v.
Anderson, 448 N.W.2d 32, 34 (Iowa 1989) (“It is of significance that the
incident was isolated.”). In addition, the court gave a general
instruction to the jury admonishing the jurors not to consider evidence
concerning other wrongful acts alleged to have been committed by Newell.
See State v. McMullin, 421 N.W.2d 517, 520 (Iowa 1988) (stating jurors are
presumed to have followed the court’s instructions absent evidence to the
contrary). Finally, the evidence against the defendant was strong. See
State v. Greene, 592 N.W.2d 24, 32 (Iowa 1999) (considering strength of
evidence in concluding no prejudice warranting a mistrial); Anderson, 448
N.W.2d at 34 (same). When the solitary reference to drug charges is
considered in the context of the entire trial and all the properly admitted
evidence, we think the trial court reasonably concluded this comment did
not prevent the defendant from receiving a fair trial with impartial
jurors.
 IX. Change of Venue.
 In his pro se brief, Newell asserts the trial court erred in denying
his request for a change of venue based upon adverse trial publicity.[1]
The defendant’s request for a change of venue was based upon a local
newspaper article and some television and radio reports broadcasted during
the first and second day of jury selection.
 The district court has authority to change the venue of a trial when
the defendant demonstrates such a degree of prejudice in the county “that
there is a substantial likelihood a fair and impartial trial cannot be
preserved with a jury selected from that county.” Iowa R. Crim. P.
2.11(9)(b). “[The] right to a fair trial by impartial jurors has its
underpinnings in our state and federal constitutions.” State v. Siemer,
454 N.W.2d 857, 860 (Iowa 1990). Therefore, our review is de novo. Id.
“Reversal is warranted only where the trial court’s decision demonstrates
an abuse of discretion.” Id.
 Our de novo review of the record reveals that the defendant’s claim
has no merit. The newspaper article concerning the defendant’s case was
essentially factual in nature. Although the radio and television
broadcasts were not introduced into evidence, from the answers given by
prospective jurors during voir dire, it appears that publicity was also
primarily fact based. Nonetheless, the newspaper article did refer to two
items of evidence the trial court had ruled inadmissible: (1) a videotaped
deposition of Mary Culbert; and (2) Newell’s history of domestic violence.
 As a result of the defendant’s motion, the court extensively voir
dired the jury panel. Only eight of the thirty-two persons on the panel
had any exposure to the article. Four jurors read it, and they were
excused. The other four prospective jurors saw the headlines and stopped
reading the article as soon as they realized what it was. Each of these
jurors stated the article did not affect his or her opinion and he or she
could be impartial. Of the seven jurors who were later added to the panel,
a few had exposure to media reporting of the case, but all believed they
could be fair and impartial.
 The media coverage of the defendant’s case was not pervasive, nor was
it inflammatory. Moreover, prejudice is not presumed based on some jurors’
“mere exposure to news accounts.” Id. at 861. We are convinced the trial
court reasonably concluded based on the nature of the publicity and its
voir dire of the panel that a fair and impartial trial could be obtained by
the defendant in Black Hawk County. Therefore, the defendant has failed to
show the court abused its discretion in denying his motion for change of
venue.
 X. Conclusion.
 We find no reversible error. Therefore, we affirm the defendant’s
conviction of first-degree murder.
 AFFIRMED.
 All justices concur except Carter, J., Lavorato, C.J., and Wiggins,
J., who concur specially.
 #158/03-0624, State v. Newell
CARTER, Justice (concurring specially).
 I join in the court’s opinion in all aspects, except its treatment of
the expert testimony of Lieutenant David Taylor. Although that testimony
does not warrant reversal of Newell’s conviction, given the strength of
other evidence against him, it should not have been allowed by the district
court.
 The challenged testimony of Lieutenant Taylor explained the issues of
power and control often involved in domestic violence and the use of
intimidation, emotional abuse, isolation of the victim, blaming the victim,
and threats. It suggested that domestic abuse may involve a continuum of
violence and the potential that the violence will escalate. The majority
opinion concludes that this testimony concerning the attributes of domestic
abuse was helpful in aiding the jury’s understanding of the relationship
between Gillen and Newell for purposes of determining Newell’s state of
mind on the night of Gillen’s death and what might have motivated him to
beat and strangle her. I submit that this was an improper use of profiling
evidence to establish Newell’s guilt.
 The situation in the present case is different from the uses of this
type of testimony approved in State v. Rodriquez, 636 N.W.2d 234, 246 (Iowa
2001); and State v. Griffin, 564 N.W.2d 370, 374 (Iowa 1997). In those
cases, the evidence was used to explain ambiguous conduct of the victims
regarding the ability to flee from the perpetrator in a kidnapping
prosecution and the reason for the recantation of the victim’s statement in
a domestic-abuse prosecution. In the present case, no similar issues were
presented concerning the conduct of the victim.
 With respect to Newell’s state of mind, the majority opinion is
implicitly referring to the State’s need to prove malice. A jury’s
determination of the elements of a crime with which an accused is charged
should be based entirely on the evidence presented in the case before the
court and not based on the conduct of others under circumstances beyond the
jury’s knowledge or consideration. Moreover, the danger presented by such
profiling evidence goes well beyond the issue of intent. There is also a
strong possibility that a jury faced with Lieutenant Taylor’s testimony
concerning a continuum of violence and a potential for escalated violence
might infer that Newell acted in conformity with the patterns of violence
alluded to by the witness and inflicted the injuries that caused Gillen’s
death. The potential for misuse of this evidence far outweighs any benefit
the jury might gain from its admission. It should have been excluded.
 Lavorato, C.J., and Wiggins, J., join this special concurrence.

-----------------------
 [1] The defendant makes numerous other claims of error. We have
considered these claims and conclude they either have no merit, error was
not preserved, or they cannot be addressed on direct appeal.